**HUMBLE OIL & REFINING CO. et al. v. BENNETT et al.**

No. 9005.

Court of Civil Appeals of Texas. Austin.

March 12, 1941.

E. H. Thornton, Jr., of Galveston, for appellants Maco Stewart, Jr., A. J. De-Lange, and Brantley Harris.

H. E. Bell, of Houston, and Powell, Rauhut & Gideon, of Austin, for appellant Humble Oil & Refining Co.

Gerald C. Mann, Atty. Gen., and Ed Roy Simmons, Asst. Atty. Gen., for appellee Railroad Commission of Texas.

Mark McGee, of Fort Worth, for appellee W. E. McKinney.

Baker, Botts, Andrews & Wharton, Tom Scurry, and Hugh M. Patterson, all of Houston, for appellee Galveston-Houston Electric Ry. Co.

Vinson, Elkins, Weems & Francis, W. S. Elkins, and W. H. Francis, Jr., all of Houston, for appellant Coast Petroleum Corporation.

BAUGH, Justice.

This is a Rule 37 case. The land involved is a portion of the Galveston Houston Electric Railway Company Right of Way in Galveston County. F. W. Bennett, D. P. Kenyon, and W. E. McKinney acquired a lease on about 32.4 acres of such right of way, 100 feet wide, running northwest and southeast at the point in question. They had drilled, under permit granted by the Railroad Commission, one well on said tract, had been granted a permit on December 21, 1937, for a second well on same approximately 4,200 feet southeast from the first, which they had not drilled; and on July 27, 1938, were granted permit for a third well on said strip located approximately 1,900 feet southeast of their well No. 1. This third permit was protested by the Coastal Petroleum Company, owner of the adjoining 200-acre leasehold on the southwest of the strip, and the Humble, owner of the adjoining 179-acre leasehold on the northeast of the strip. The permit was granted to prevent confiscation, and the Coastal and Humble seek by this suit to set it aside on the ground that it was not necessary for that purpose. Kenyon conveyed his interest in the leasehold to Bennett, who defaulted in this suit; and it was defended below by McKinney, owner of an overriding two ninths interest in the leasehold, by the Railroad Commission, and by the intervener, Galveston Houston Electric Railway Company, owner of the royalty in the right of way. Trial was to the court without a jury and at the close of plaintiff's evidence, upon motion of the defendants, judgment rendered against the plaintiffs; hence this appeal.

The spacings in this area prescribed by Rule 37 were 330-660 feet, or one well to

10 acres. It is manifest that this 100-foot wide strip could be developed only through exceptions to the Rule. While the general principles relating to confiscation in such cases are now well settled, their application to the instant case has been rendered difficult because of the unusual fact situation presented.

The entire lease of appellees aggregated approximately 32.4 acres. Only 10.7 acres of it lies immediately between the Coastal lease and the Humble lease. The Coastal 200-acre lease had nine wells thereon. The Humble lease of 179 acres had seven wells. The remaining portion of the appellees' 32.4-acre lease extended both northwest and southeast of the common area.

While the 330-660-foot spacings authorized one well to each 10 acres, appellants claim to have developed their leases on the basis of one well to 20 acres; and their witnesses testified that in this area one well would drain 20 acres surrounding it. The gist of appellants' contention is that since the 10.7 acres of said strip, directly between appellants' leases, already had one well capable of draining and actually draining 20 acres; whereas, appellants' adjoining tracts were drilled to a density of one well to each 20 acres or more, and since the daily allowable of 74 barrels was allotted to most of these wells, the appellees already had a drainage per acre advantage over appellants of 2 to 1; and that if a second well be permitted on this 10.7-acre strip this disparity will be greatly increased. And that with the one well, disregarding the permit, not drilled, for the second well to the southeast on appellees' lease, appellees already had a fair and equal opportunity with the adjacent leaseholders to recover their fair share of oil in place, or its equivalent, beneath their tract.

If the underground conditions, the well potentials, and daily allowables throughout this area had been substantially uniform, such contention, under numerous cases arising in the East Texas field heretofore decided by this court, might be correct. That is, that no confiscation of appellees' property, the only question here presented, without the additional well would result. But the question presented is not that simple. Since the confiscation issue is dependent in the main on the question of drainage, and so far as appellants are concerned that is referable to wells on said strip within drainage distance of their re-

spective tracts, the conditions existing on the portions of appellees' right of way strip beyond drainage distance from appellants' tracts would not affect appellants' rights on this issue. That is, appellees with a 32.4-acre lease, only 100 feet wide, would not be entitled to extract the equivalent of the total amount of oil under the entire 32.4 acres from the 10.7-acre section thereof adjoining appellants' leases, a great portion of which would necessarily be drained from beneath appellants' lands. Since the undrilled permit No. 2 of appellees was for a well on said strip 750 feet removed from the nearest point of appellants' leases, and would not, if drilled, drain any oil from beneath their leaseholds, it could not affect appellants' rights on that issue. Consequently it may be disregarded for the purposes of our inquiry here.

But underground conditions in this area were shown to be far from uniform. It is located in what is known as a salt dome area, not a common pool. There had been found at varying depths five separate producing oil sands in the area, some of which extended under parts of both appellants' and appellees' leases, and others were found under other portions. Neither the presence of these sands, their thickness over any appreciable area, nor the gas pressure were at all uniform. What was known as the "Humble sand," the most productive, was encountered at from 8,700 feet to 9,000 feet. The other sands were encountered nearer the surface. No portion of the area here involved appears to be underlaid with all five sands, and the thickness of such sands where found and the gas-oil ratio therein were not uniform over any appreciable area. The areas so underlaid by these various sands, as testified to by appellants' witnesses, in view of the distances between wells already drilled, manifestly could not be accurately defined, but were largely estimates only. In estimating the amount of oil recoverable through wells in this area, appellants' witnesses predicated such estimates, in the main, on an oil-gas ratio of 2,000 to one, and where such oil-gas ratio exceeded 3,500 to one such wells were not classed as oil wells, but as producers of gas or gas distillate. Notwithstanding such classifications by appellants' witnesses, however, it was shown that the Humble No. 11, located 433 feet from the strip in question, was classified by the Railroad Commission as an oil well, and was producing under an oil-

gas ratio of 15,900 to one, with an allowable of 47 barrels per day, compared with a 74-barrel per day allowable for other wells in this area with a less oil-gas ratio.

■■ If the testimony of these witnesses be true that a well in this area will drain twenty acres, the four wells on the Coast 200-acre tract to the southwest, set back from 329 feet to 400 feet from this tract, were all draining oil from beneath appellees' tract. The same would be true of four Humble wells to the northeast staggered alongside this strip of land. In other words, under such testimony, there were eight producing wells on appellants' tracts within drainage distance of this 10.7-acre strip. It was further shown that the oil-gas ratio of the nine wells on the Coast 200-acre tract varied from approximately 2,000 to one to more than 9,000 to one; and that on the Humble 179-acre tract in one of its wells the ratio ran as high as 27,000 to one, which well had a daily allowable of only 27 barrels. Further, that of the nine Coast tract wells, four of them were staggered alongside appellees' tract at distances of 400 feet or less, and in the portion of the Coast tract, beyond drainage distance from this strip, areas far in excess of 20 acres contained no wells at all. The same was true of the Humble 179-acre tract. Four of the latter's seven wells were within 468 feet of this strip, with the more remote portions of the Humble tract largely undeveloped, even on a 20-acre per well pattern. This was accounted for by widely varying underground conditions, e. g., gas pressure, or absence of some, or all, of the several oil sands, a wide variation in the oil-gas ratio, sand thickness, etc. In brief, lack of uniformity in underground conditions. Even if underground conditions had been uniform, density of wells on the tracts of appellants, calculated by merely dividing the total number of wells thereon into the total acreage, does not afford a conclusive criterion on the issue of confiscation. The density rule, to afford an equitable criterion, where predicated upon substantially uniform underground conditions, presupposed a reasonably uniform pattern of development of the surrounding area. That is, location and spacing of wells with reference to the lands involved on a reasonably uniform pattern under Rule 37. Manifestly, a 200-acre tract with ten wells, all drilled, for example, on the east 100 acres thereof, and none on the west 100 acres, would not constitute a development of the whole on a 20-acre per well pattern, and should not properly be so considered. Shell Oil Co. v. Railroad Commission, Tex.Civ.App., 133 S.W.2d 791.

■ Appellants further insist that since, according to the testimony of their witnesses, one well will drain 20 acres surrounding it in this area, and they had developed their adjoining leaseholds on that basis (which taking their tracts as a whole, was not accurate), appellees with one well already drilled on the 10.7-acre tract between and adjacent to their leaseholds, already had a drainage advantage over them. This contention, however, does not take into account the fact that the spacing provisions of Rule 37 applicable to this area (660-330 feet) authorized development of the area on the basis of one well to 10 acres without the necessity of an *exception* to the Rule to do so. Such a spacing provision implies a finding by the Commission, we think, that a well would drain 10 acres instead of 20, as insisted by appellants. Appellees were entitled to develop their tract, even if exceptions to Rule 37 were necessary to do so, on a basis of one well to 10 acres, if that were necessary, as the Commission evidently so concluded, to enable them to recover the equivalent of the oil beneath their lands. The appellants were entitled under the Rule, *without an exception thereto,* to do the same. The mere fact that they elected, for reasons satisfactory to themselves, to develop their leases to only half the density which the Rule itself authorized, affords no sufficient ground for them to insist that an adjoining leaseholder's rights are referable to a 20-acre drilling pattern, adopted by them, instead of a 10-acre drilling pattern authorized by the Commission. If a larger drilling pattern for this area were proper, that was a matter for the Commission to determine. We are here concerned only with the spacings provided in the Rule, as established by the Commission.

■ Appellants also insist that the one well on appellees' strip producing from the "Humble sand" is clearly sufficient to protect them from drainage in that sand; and if entitled to another well, based on the total amount of oil in all sands underlying their tract, same should have been authorized only to one of the shallower less productive sands. The permit in question does not refer to any of these oil sands. It merely authorizes a maximum depth of 9,000 feet. The drilling of such well is

subject to the regulations of the Commission. It still has jurisdiction, we think, to regulate this matter, and control the drilling thereof so as to prevent waste and to prevent confiscation; and appellants' relief in this regard would, we think, be a matter for the Commission to determine. It does not appear whether their protests in this regard were made before the Commission, nor that the Commission passed upon this question. Their contention appears to have been that appellees were not entitled to any more wells at all. It not appearing that the Commission passed upon this contention, it is not before us for determination here. Gulf Land Co. v. Atlantic Ref. Co., 134 Tex. 59, 131 S.W.2d 73.

In the light of all the facts and circumstances, above outlined, we are not prepared to say that there was not substantial evidence before the Commission upon which to justify a permit for an additional well on appellees' tract, within the area involved, in order to prevent confiscation of their property, as that term has been considered in numerous adjudicated Rule 37 cases, not necessary to be here cited. Not having met the burden of proof in this regard resting upon appellants in attacking the permit in question, the judgment of the trial court is affirmed.

Affirmed.