### F. A. GILLESPIE & SONS CO. et al. v. RAILROAD COMMISSION et al.

No. 9227.

Court of Civil Appeals of Texas. Austin.

March 4, 1942.

Rehearing Denied April 1, 1942.

Young & Easterling, of Corpus Christi, for appellants S. E. W. Oil Corporation and Bay-Tex Oil Corporation.

C. B. Ellard, of Dallas, for appellant Atlantic Refining Co.

Edward S. Boyles, of Houston, for appellant First Nat. Bank of Houston.

Black, Graves & Stayton, of Austin, for appellants F. A. Gillespie & Sons Co., Atlantic Refining Co., and First Nat. Bank in Houston.

Gerald C. Mann, Atty. Gen., and Tom D. Rowell, Jr., James D. Smullen, and E.

R. Simmons, Asst. Attys. Gen., for appellee Railroad Commission of Texas.

Raybourne Thompson and Chas. I. Francis, both of Houston, and Gillis Johnson, of Fort Worth (Vinson, Elkins, Weems & Francis, of Houston, and Cantey, Hanger, McMahon, McKnight & Johnson, of Fort Worth, of counsel), for appellee Shasta Oil Co.

BAUGH, Justice.

Appeal is from an order of the district court refusing to grant a temporary injunction against the enforcement of certain conservation orders promulgated by the Railroad Commission. The suit was brought by F. A. Gillespie & Sons Company, hereinafter referred to as Gillespie, against the Commission, in which other interested parties intervened as plaintiffs; and the Shasta Oil Company, hereafter referred to as Shasta, intervened as defendant. The suit was brought to test the validity of two orders of the Commission, entered respectively on May 10, 1941, and June 5, 1941, relating to the Aransas Pass oil field.

A resume of the historical background of this field will contribute to a better understanding of the issues presented. Prior to the discovery of oil in this field a considerable portion of the area adjacent to the City of Aransas Pass had been subdivided into 5-acre tracts, and fee title thereto had been separately acquired. Much of this subdivided area is located in proven territory and many separate leases on these 5-acre tracts had been made. Consequently no voluntary subdivision so as to require an exception to Rule 37 for development thereof is involved. It is a deep field, more than 7,000 feet below the surface, and the underground conditions as to sand thickness, pressure, permeability, porosity, etc., are practically uniform.

After oil was discovered, the Commission promulgated on October 9, 1936, two special rules applicable to this field, Rule 1 being a spacing rule; and Rule 20 being a proration rule. The spacings provided were 330-660 feet, with exceptions "when necessary to conform to the irregularities in shape of separately owned or combined tracts of ten (10) acres or approximately ten (10) acres" where necessary to prevent waste or confiscation.

The portion of the proration rule pertinent here provided: "Rule 20: (a) The field shall be prorated on the basis of acreage units with fifty (50) per cent of the field outlet assigned to acreage, and fifty (50) per cent assigned to the average potential of the wells on the unit. The acreage unit shall be ten (10) acres, except that the last unit drilled on any particular lease may have credit for a maximum of fifteen (15) acres, provided the size of the tract so warrants."

This rule manifestly and clearly contemplated and provided for a field development on a 10-acre spacing pattern. That is, one well to each 10 acres, and where a lease contained an odd number of acres, 65 acres for example, to permit a well to each 10 acres up to 50, and one well to the remaining 15 acres, with an additional allowable based on acreage for that well, rather than the drilling of two wells on such 15-acre remainder. The Shasta owned a number of these 5-acre tracts and had developed them, under said rule, by drilling one well on combinations of two of such 5-acre tracts. In July, 1939, the Commission amended its Rule 20 so as to make the allowable for each 10-acre well in the entire field the same regardless of its individual potential; with variations under the tolerance provision only where one well was drilled under said rule on an acreage unit between 10 and 15.

In July, 1939, the Atlantic Refining Company, owner of numerous 5-acre tracts, procured a 15-acre allowable for one well by combining three of its 5-acre tracts. Thereafter Gillespie acquired from the Atlantic 27 of these 5-acre tracts and under separate permits granted by the Commission developed these tracts by combining 3 of them as a unit, drilled 9 wells thereon instead of 13 required under the 10-acre spacing pattern, and procured allowables for each under the tolerance provision of said rule of 15 acres per well. All of these permits were protested by the Shasta as in violation of Rule 20, and as a discrimination against it, since it had developed its 5-acre tracts on a pattern of one well to 10 acres.

Finally at the instance of Shasta, the Commission held a hearing on March 21, 1941, in which the alleged discrimination against Shasta, and the manner in which said rules were being administered was fully gone into; and as a result of which the rules herein attacked were promulgated. The only material change in Rule 20 made by the May 10th amendment was a provision that: "The acreage unit shall

be ten (10) acres, and no tract of less than ten (10) acres shall be combined to obtain a unit of more than ten (10) acres." The net result of this was to reduce the 15-acre tolerance allowable theretofore granted to combinations of three 5-acre tracts back to a 10-acre basis, that on which the Shasta and others had developed their subdivision leases and to which they were limited.

Gillespie contends that because it had, through contracts with the separate owners of royalties in these numerous 5-acre tracts, procured voluntary pooling of its 27 5-acre tracts into units of 15 acres each for development purposes, and had acquired same from the Atlantic on that basis; and because the Commission had granted it 9 permits for wells on such 15-acre units with knowledge of these facts and had thereby induced it, at heavy expense, to develop such pooled 15-acre units, and had given it a 15-acre allowable for each well, it thereby procured a vested right, which the amended rule, if enforced against it, would destroy; and that as to these, the order was unconstitutional as retroactive.

Under both the rule of October 9, 1936, and that of May 10, 1941, a well on a 15-acre unit was permitted to produce 48 barrels per day; but a well on a 10-acre unit was allowed only 38 barrels per day. If, therefore, one owner of a number of these 5-acre tracts had, as required by the original rule, developed his tracts on the 10-acre spacing pattern, that is, one well on a combination of two 5-acre tracts, and thus was allocated 38 barrels per day; while another owner was permitted to combine three 5-acre tracts to one well, and to produce from it 48 barrels per day, a discrimination is thereby created in the application of such rule, and this is true without regard to whose benefit the discrimination accrued, whether to Shasta or to Gillespie. It is clear from the language of the original rule that "The acreage unit shall be ten (10) acres, except that the last unit drilled on any particular lease may have a credit for a maximum of fifteen (15) acres, provided the size of the tract so warrants," had reference only to the acreage left over after such particular lease or tract had been developed as far as possible on a 10-acre pattern. The 15-acre tolerance provision was manifestly in the nature of an exception to the general spacing pattern so as to permit one well on left over acreage in excess of ten acres, with compensatory increase of allowable, rather than have two wells on such excess acreage, each with less than ten acres, and with lower allowables.

We find nothing in the language of the rule which could be construed to authorize 15-acre poolings of separate 5-acre tracts or leases, capable of development on the stated 10-acre pattern by pooling three instead of two 5-acre tracts; and by so doing be entitled under such exception, to the tolerance permitted to left over acreage in a particular tract. There is evidence to show that the production supervisor of the Commission advised Gillespie before he acquired these 5-acre tracts that he would be entitled to a 15-acre tolerance on such 15-acre combinations; that his applications for permits for his wells state that they were requested on a 15-acre pattern instead of a 10-acre pattern; and that the protests of the Shasta were based on the contention that a 15-acre combination of tracts with such additional allowable was not authorized by such rule. This matter must therefore have come to the attention of the Commissioners who signed the permits; but it is now settled that the Commission itself is bound by its own valid rules, and permits granted in violation of them cannot be sustained. But the permits for wells granted to Gillespie on such 15-acre combinations were not in the main granted as exceptions to the Commission's spacing rule. He was entitled to a well on ten acres as a matter of right, under said rule. He chose, instead, because of cost of drilling to drill on a 15-acre pattern. The Commission did not have authority, under the prescribed spacing pattern, to compel him to drill to a greater density; but they clearly had the authority to fix his allowable on the basis of a 10-acre pattern unless he did. And the fact that the Commission had either by inadvertence or knowingly, but in violation of its own rule, given him by special permit a greater allowable than he was entitled to under that rule, and had thereby created discrimination between operators in the field, gave him no vested right to continue such unauthorized allowable. Under the original rule he was not entitled by combining three separate 5-acre tracts to be given the 15-acre tolerance allowable; and the discrimination created by it could have been prevented by suit, even without the amended order of May 10, 1941. Gulf Land Co. v. Atlantic

Ref. Co., 134 Tex. 59, 131 S.W.2d 73. Since the Commission's rules permit pooling of two 5-acre tracts to one well, even though such tracts, within prescribed limitations, are not contiguous, the mere fact that Gillespie has elected to drill only one well to each 15 acres of his combined leases, presents no obstacle to his yet developing same on a basis of one well to each 10 acres, as the Commission's original rules clearly contemplated and required. The mere fact that he does not deem it economically profitable to do so, neither gives him any right to an exception to the general rule laid down by the Commission as a conservation measure for the development of the field; nor does it authorize the Commission to give him a right to do so.

 Clearly Gillespie could not, by entering into contracts with others as to pooling of acreage, either with or without the knowledge or consent of the Commission, acquire any vested right which would deprive the Commission of the power to prorate his production so as to prevent waste. And the effect of the orders complained of is merely that. Certainly he could not by contract to deliver a given quantity of oil from designated wells, made with the knowledge and consent of the Commission and based upon the allowable as then fixed by the Commission, thereafter prevent the Commission from reducing such allowable, if such reduction were necessary to conserve the natural resources of the State. Nor could he, by pooling small tracts into a larger unit than that prescribed by the Commission, any more enlarge the spacing pattern so fixed by the Commission, if doing so tended to cause waste; than he could by subdividing a larger tract into 5-acre tracts so as to reduce the spacing pattern prescribed by the Commission. That such subdivision into smaller tracts is not authorized, is now so well settled as not to require citation of authorities. In brief, there is no difference in principle between voluntary combinations of tracts and voluntary subdivisions of tracts, if the result be to circumvent the conservation rules of the Commission and render them ineffective to accomplish their purposes.

 Nor do we construe the amendment of May 10, 1941, complained of as the promulgation of a new rule. It is designated only as an amendment to an existing rule, but it is, we think, nothing more nor less, than an official interpretation and clarification by the Commission of its October 9, 1936, rule, which already required the same thing to be done that the amendment provided. It follows therefore that the clarifying amendment complained of was not retroactive for the reason that the 15-acre poolings of small tracts made by Gillespie were never authorized under the original rule, whether consented to by the Commission or not. An operator's rights must be acquired in compliance with the provisions of a valid rule of the Commission; and none can be acquired in violation of it. And this is true even though the acts of the operator constituting such violation be performed under permission granted by the Commission. This question was determined in the early Rule 37 cases reported in 68 S. W.2d pp. 609 to 628, approved by the Supreme Court, and consistently followed since then.

If the 15-acre tolerance permitted by the Commission through combinations of three 5-acre tracts had been authorized, and had constituted valid exceptions to the Commission's general rule, then Gillespie would have acquired vested property rights through its contracts thereunder which it would have been entitled to have protected. But under our above construction of such original rule, they were not, and the holdings in Wencker v. R. R. Comm., Tex.Civ.App., 149 S.W.2d 1009, and Humble Oil & Ref. Co. v. R. R. Comm., Tex.Civ.App., 94 S.W.2d 1197, are inapplicable.

 Nor does the fact, if admitted, that Shasta with one well to 10 acres with a 38-barrel allowable may recover its fair share of oil in place beneath its leases, or is recovering more oil per acre per day than Gillespie with one well to 15 acres with a 48-barrel per day allowable, affect the validity of the interpretative orders attacked. The private rights of the operators are not controlling. Confiscation is not involved. The issues presented would be the same had Shasta not been a party to this suit. Gillespie sued the Commission, and its defenses are the same without the intervention of Shasta. Nor is it material whether the issue of waste as such was presented in the hearing of March 21, 1941, on which the amendments were based. It must be presumed that the 10-acre pattern of development prescribed

by the Commission in its order of October 9, 1936, for this field, and never changed by subsequent general order, was found by the Commission as a proper and necessary spacing pattern in the exercise of its conservation powers. It could be sustained on no other ground. Not only is this true, but under the holding . of the Supreme Court in Gulf Land Co. v. Atlantic Ref. Co., supra, the Commission was required to so administer it as to prevent, not create, discrimination between operators in the field regardless of which operators are discriminated against. And when such discriminations are properly brought to the attention of the Commission it was its duty to remove them in keeping with valid orders already in force and controlling. This is what it undertook to do in the instant case. Whether conservation as such was presented to the Commission in the March 21, 1941, hearing or not, conformity to the prescribed 10-acre drilling pattern was the matter of primary consideration at that hearing, and the very subject matter of that investigation necessarily involved the issue of conservation, not, perhaps, as to a particular lease or well, but as to the field as a whole. The orders attacked are general both in character and terms, applicable to the field as a whole, and must be so considered.

This case presents the antithesis of the numerous Rule 37 cases heretofore brought before us for review. That is, instead of seeking to vary the general spacing pattern through drilling wells at closer distances and on less acreage than prescribed; the Gillespie, and others similarly situated, seek, because of the expense of drilling wells to such depth, to enlarge the prescribed 10-acre spacing pattern to 15 acres per well and then compensate the sparser drilling by an increased allowable per well. Such, we think, was never authorized under the general rules promulgated by the Commission specifically governing the development of this field; and can acquire no validity through permissive practices with the Commission's consent in violation of their own valid and unambiguous rules already in force, and which had never been repealed, revoked nor amended. The pattern prescribed by the Commission is the one with which we are concerned; not a different one adopted by the operators and sought to be applied. See Humble Oil & Ref. Co. v. Bennett, Tex.Civ.App., 149 S. W.2d 220, 223.

Nor is this suit merely a controversy, as urged by appellants, between operators in the field involving only their private property rights. On the contrary, it is an attack upon what is manifestly an interpretative amendment by the Commission of a former general order, legislative and prospective in character; and involves, in effect, the issue as to whether the Commission has properly interpreted its own general spacing and proration rules promulgated in October, 1936. The validity of the orders attacked, as we view it, is dependent upon whether the Commission has correctly done so. We conclude that they have.

While we have not undertaken to state and discuss the numerous contentions made by appellants, nor the authorities cited as sustaining them, what we have said is determinative of the controlling issues presented as we understand the record.

Finding no error, the judgment of the trial court is affirmed.

Affirmed.