RAILROAD COMMISSION OF TEXAS V. C. F. DeBARDELEBEN, JR.

No. A-6222. Decided July 24, 1957.
Rehearing overruled October 2, 1957.
(305 S.W. 2d Series 141.)

*Will Wilson,* Attorney General, *James N. Ludlum, James Wilson* and *Edward A. Cazares,* Assistants Attorney General, for petitioner.

*Small, Small & Craig,* all of Austin, for respondent.

MR. JUSTICE CULVER delivered the opinion of the Court.

This suit brought by respondent, DeBardeleben, attacked an order of the Railroad Commission that denied him exceptions to the Statewide Density Rule for four gas wells in the Bethany Field in Harrison and Panola Counties. The Court of Civil Appeals affirmed a judgment in favor of respondent. 297 S.W. 2d 203. In that affirmance we concur.

■ Substantially the only question for decision here is whether or not the evidence shows as a matter of law that respondent's gas producing properties are being confiscated, or in other words, was the order of the Railroad Commission reasonably supported by substantial evidence.

Originally the area now composing the Bethany Gas Field was treated by the Commission as two separate and distinct fields, Bethany to the south and lying principally in Panola County and Elysian Fields to the north in Harrison County. As development progressed, the distance between these two fields was gradually narrowed to the point of mergence. On September 15, 1955 the Commission found that the two fields were pro-

ducing from a common reservoir and ordered them combined under the designation of Bethany Field and under Bethany Field Rules. Prior to this combination the spacing and density rules in the two fields differed substantially. In the Bethany Field it had been determined that one well would effectively drain 640 acres and proration units were so set up with one well to the unit. In the Elysian Field the per well unit was 320 acres.

Petitioner admits that respondent's leases were located in what might be called the "twilight zone" between the two fields and could possibly have been considered in either at the time of the original designation by respondent. Considerable latitude was permitted to the operator in determining in which field his properties should be placed.

Respondent owned four units of approximately 640 acres each and designated by him and the Commission as being in the original Bethany Field. On each of these four tracts one well had been drilled according to the Bethany Rules. The applications to drill these wells were made in the latter part of 1954 and early in 1955. Permits were issued, the wells were drilled and production obtained.

In July 1955 respondent made application to drill four more wells on four additional units of 320 acres each, carved out of four 640 acre units. This was done without permission of or notice to the Comimssion. He falsely represented these tracts as lying within Elysian Field. His applications were examined, appeared to be in order and in compliance with the Elysian Field Rules of one well to 320 acres. Permits were accordingly granted and the wells drilled.

The Commission thereafter having discovered the misrepresentation refused to grant production allowables for these four wells and ordered them sealed. It then denied respondent's application for exception to the Density Rule on the ground that the evidence did not justify an exception either for the prevention of waste or for the protection of correlative rights. Although there are some extenuating circumstances, there can be no question but that respondent did obtain the permits in question through misrepresentation of fact and this conduct is not in the least to be condoned, as said by the Court of Civil Appeals. Even so, if respondent would have been entitled to drill the four wells to protect against confiscation of and drain-

age from his property by offsetting wells to the north and east, that were drilled according to the Elysian Field and as close as 330 feet to respondent's property line, while under the Bethany Rules respondent could drill no nearer his neighbor's line than 1320 feet, we think production from these wells should not be denied.

Respondent's claim of confiscation is based upon these points: (1) the reservoir under the Bethany and Elysian Fields is common, continuous and in free communication; (2) the pressure of the four original wells drilled on the 640-acre units is uniformly higher than that of the surrounding offset wells and it is an admitted physical fact that gas will flow from a high pressure area to a low pressure area if the reservoir is continuous and in communication; (3) the area that one well will drain had been determined by the Railroad Commission to be 640-acre units; (4) respondent's original wells are on 640-acre units, but the offsets to the north and east are on 320-acre units, are closer to the northern and eastern limits of respondent's units, and the offsets are producing more cubic feet per acre than respondent's wells; (5) if respondent was allowed to produce from the four additional wells he would approximate the cubic feet per acre production of the offsets in the adjoining 320-acre units; (6) the Railroad Commission itself recognized the situation by reciting in its order, combining the two fields, that different rules for the two fields were causing "inequitable conditions to exist;" (7) the drainage from respondent's 640-acre units is uncompensated by any drainage to his properties from the south, east and west.

■ Confiscation, as that term is used here, means the denial to an owner or lessee of a fair chance to recover the oil or gas in or under his land or the equivalent in kind. Railroad Commission of Texas v. Gulf Production Co., 134 Texas 122, 132 S.W. 2d 254; Gulf Land Co. v. Atlantic Refining Co., 134 Texas 59, 131 S.W. 2d 73.

A valid contention that a tract of land is being drained and the property being confiscated must be based upon a finding that the reservoirs underlying the tracts are actually one reservoir with free communication between the tracts.

The Railroad Commission's order of September 13, 1955 provides in part as follows:

"Whereas, fro mevidence adduced at said hearing and from information contained in Commission records and reports, it appears to the Commission that, among other things, The Elysian Fields and Bethany Fields area, each of which had developed separately for several years, had, through such continuing development operation *joined and become a common field with the reservoirs underlying such area recognized as common and continuous throughout the two-field area* * * *." (Emphasis supplied.)

Only two witnesses testified on the trial of this case. Jack K. Baumel, a consultant petroleum and natural gas engineer, was a witness for respondent. Mr. Baumel was in the employ of the Railroad Commission for some fifteen years and was Director of Production and Chief Engineer in charge of the Oil & Gas Division for ten years ending in 1952. John S. Cameron, engineer in charge of the Commission's gas department, testified in behalf of the Railroad Commission.

The testimony of the witness, Baumel, substantiates the respondent's contentions. That testimony is set forth in considerable detail in the Court of Civil Appeals' opinion and will not be reinstated here. Mr. Cameron stated that his idea of a common reservoir is one that is continuous and in reasonable communication throughout its length and breadth through a semi-permeable formation of some sort. Mr. Cameron refused to testify regarding the drainage in this case, giving as his reason that he was not sufficiently acquainted with the formation of the reservoir. On the other hand Mr. Baumel was positively of the opinion, based as he says, on engineering data, and his knowledge of the pressures and structures in this area, that drainage from respondent's properties is taking place and will continue unless these additional wells are allowed to operate. Otherwise, he says, the respondent does not have a fair chance to recover the gas and liquid hydrocarbons in the Pettit zone underlying his properties. Considering the amount of production from respondent's four original wells and the actual tests run on the new wells, Baumel calculates that, if the new wells are granted allowables, respondent on his tracts will approximate the per acre production of his neighbors to the north and east in what was formerly Elysian Field, but that under present conditions respondent would lose half of the recoverable gas under his acreage by the drainage to offset wells on the northeast.

Based on the Commission's assumption that one well would

effectively drain an area of 640 acres, there are seven producing offsets that reach well within respondent's properties. In fact each of three of these offsets would appear from their proximity to drain from respondent's units on two sides.

The petitioner-Commission takes the position that respondent's problem is not one of drainage, but rather that his wells are poor producers and that three of the four original wells are unable to make their quota to which they are entitled under the Bethany Field formula, while the seven offsetting wells produce their full allowable. Petitioner argues that the comparison of bottom hole pressures between respondent's original wells and the offsets does not necessarily prove drainage to respondent's disadvantage. Petitioner cites the testimony of respondent's witness, Baumel, to the effect that porosity in this Pettit zone throughout the East Texas area is spotty, and that it can differ so greatly within a small local area that a distance of less than a mile may result in the difference between a good well and a poor one. This testimony, says the petitioner, can be relied upon as establishing that it is not at all unusual for poor communication to occur locally between neighboring wells within this field and the fact that pressures have not equalized after a number of years of development would show that there is no free and unrestricted communication throughout the field. On the other hand, Mr. Baumel was speaking of the Pettit zone generally through East Texas. He testified that as a result of extensive study he had determined that respondent's property is favorably situated in regard to the trend of porosity in that particular area and that concentrated drilling operations near respondent's property confirm that conclusion. He asserted that if production was discontinued pressures would tend to equalize but not while seven offset producers to respondent's four wells are producing twice as much gas per acre.

Assuming as we must, in keeping with the testimony that an equal amount of gas per acre underlies respondent's property as that contained under those to the north and east, if respondent's four original wells are poor producers it would seem that fact in itself would tend to show rather that respondent without the additional wells would not have a fair chance of producing the gas underlying his properties at least so long as the rate of production preponderates so heavily in favor of his neighbors to the north and east.

■ We are equally convinced that respondent also established that this loss is not compensated for by drainage to his proper-

ties to the south, east and west. Respondent's original wells seem to be reasonably well offset by producers on adjoining properties on those sides and the pressure for each of these offsets in the Pettit zone is well below that of respondent's four wells. It is admitted that the gas will not flow from a low to a high pressure area but the converse of that is true. In our opinion the evidence establishes that confiscation of respondent's properties is taking place and that the decision of the Railroad Commission to the contrary is not reasonably supported by substantial evidence.

It is argued that the permits issued by the Commission to drill the four additional wells were void, being in violation of the Commission's rules and regulations and that the permittee received no authority to drill under such an illegal permit so that the issue of confiscation should never have been reached. Therefore the petitioner says that judgment should be reversed and rendered and DeBardeleben required to seek his remedy before the Commission in a proper manner. On this point petitioner cites Railroad Commission of Texas v. Gulf Production Co., supra; Gulf Land Co. v. Atlantic Refining Co., supra, and Gillespie & Sons v. Railroad Commission, Texas Civ. App., 161 S.W. 2d 159, er. ref. From an examination of these authorities they appear to lend little aid or support to petitioner's contention. In Railroad Commission v. Gulf Production Company, the court found that there was neither waste nor confiscation. In Gulf v. Atlantic Refining Company, the principal ruling was to the effect that where a subdivision came into existence after the effective date of Rule 37 it was not entitled to protection against confiscation. In Gillespie v. Railroad Commission confiscation was not involved.

Petitioner also relies upon Railroad Commission v. Magnolia Petroleum Co., Texas Civ. App., 125 S.W. 2d 398, er. ref. In this case the Commission granted an exception to Rule 37 to prevent confiscation, but the permittee had drilled the well at a location different from that specified in the permit. The Court of Civil Appeals affirmed the trial court's judgment setting aside the Commission's order and enjoining production from the well because there was not a substantial compliance with the order, although the court considered that drainage sufficient to justify an exception to Rule 37 had been shown. The judgment was entered without prejudice to the applicant's right to apply to the Commission for an order to drill at a proper location. In that case it was observed that although the Commission made no objection to the location of the well

this did not validate non-compliance with the order for the reason that the Commission could only act after notice and hearing. We think this case is not applicable to our facts. No objection is urged here so far as the locations of the wells are concerned.

■ The argument is further presented that respondent has in no way made a proper application to the Commission for an exception to the Density Rule. Petitioner says that the necessary steps include the filing of a Form 1 application for each well accompanied by a certified plat showing (1) the entire unitized tract on which the proposed well is to be located, (2) the acreage assigned to the proposed well, and (3) the acreage previously assigned to all other wells. Petitioner says that a judgment adverse to respondent in this case would not work a forfeiture of his four wells; that he should go back and file the proper application for an exception to the density and spacing rules and then have the Commission determine the matter of confiscation.

We do not agree with this contention. In the first place all of the facts were before the Commission at the time of the hearing. Respondent's petition asserts that the Railroad Commission on its own motion on December 20, 1955 gave notice of hearing to be held to consider whether these wells should be granted an exception to the Statewide Density Order. Be that as it may, the order of the Commission recites that "whereas, after due notice, the Railroad Commission of Texas held a hearing on January 11, 1956, to consider the application of C. F. DeBardeleben, Jr. for exceptions to the Density Order applying to four wells in the Bethany Field, Panola and Harrison Counties, Texas, * * *." The application was not rejected on account of any lack of sufficiency, but the Commission, after reciting fully all of the facts found "that no good and sufficient reason was advanced at said hearing which would justify exception to said special field rule either for the prevention of waste or for the protection of correlative rights." The order further recited that the motion for rehearing was denied. Under this record we fail to see any recourse open to respondent other than the one he took of applying to the court for redress. We likewise do not understand how the reversal and rendition of this case in favor of the Commission would not be a final adjudication of respondent's rights to produce from the four wells unless, of course, the Commission should reverse itself on the finding of confiscation.

The judgment of the Court of Civil Appeals is affirmed.

Opinion delivered July 24, 1957.

MR. JUSTICE NORVELL, concurring.

As an abstract proposition, I am inclined to agree with the argument advanced by the Attorney General that the Railroad Commission could properly consider the permits issued to De-Bardeleben for the drilling of four Lower Pettit gas wells in the Elysian Fields area as null and void because such permits were issued in violation of the Commission's rules and regulations as a result of the fraud of the applicant in withholding required factual data. It would follow that the Commission could properly refuse to set allowables for such wells until valid permits had been obtained. F. A. Gillespie & Sons Co. v. Railroad Commission, Texas Civ. App., 161 S.W. 2d 159, wr. ref.

However this was not the ground upon which the special order denying DeBardeleben's application for exceptions to the density order was placed. Railroad Commission of Texas v. Gulf Production Company, 134 Texas 122, 132 S.W. 2d 254. While in said order the Commission recited that its rules had been violated, the application was denied because the Commission was of the opinion and found "that the well density on the four unitized tracts in question is one well to each 640 acres which is in accordance with the density pattern allowed by the Bethany Field special field rules; that no good and sufficient reason was advanced at said hearing which would justify exception to said special field rule either for the prevention of waste or for the protection of correlative rights."

It further appears that the contention that the four well permits involved were subject to avoidance by the Commission was not squarely presented to the Court of Civil Appeals. The point there urged was that "the trial court erred in granting equitable relief to DeBardeleben for the reason DeBardeleben did not come into court with clean hands and he was a law violator." While there may be similarities between the respective contentions, there are also obvious differences. The acceptance of the "clean hands doctrine" would bar DeBardeleben's claim to a court's protection to prevent confiscation of his property. The Court of Civil Appeals correctly held that such doctrine was not applicable here. On the other hand the avoidance of the well permits would simply require the applicant to start over and in an orderly way obtain his permits, allowables, etc.

Considering the basis of the Commission's order and the fact that we are not authorized to reverse a judgment upon a point not raised in the Court of Civil Appeals, I concur in the judgment of affirmance.

Opinion delivered July 24, 1957.

MR. JUSTICE SMITH, joined by JUSTICE GRIFFIN, dissenting. This suit was brought by the respondent in the District Court of Travis County to test the validity of orders and acts of the Railroad Commission of Texas, and specifically for the purpose of determining the validity of Railroad Commission Order No. 6-3219, dated February 20, 1956, entitled "Special Order Denying the Application of C. F. DeBardeleben, Jr. for exceptions to the density Order for Four Wells in the Bethany Field, Panola and Harrison Counties, Texas," as well as the validity of actions of the Railroad Commission of Texas, its agents and employees in applying the Commission's Special Order No. 20-27-088 (statewide density) to respondent's wells. The respondent sought to enjoin the Railroad Commission from interfering with him in producing natural gas ratably from the same common reservoir; and from applying the Commission's Special Order No. 20-27-088 (statewide density) to said four wells.

The primary question before us is: Was the Railroad Commission's order No. 32,919, denying the application of C. F. De-Bardeleben, Jr. for exceptions to the Density Order (statewide No. 20-27-088) for four wells in the Bethany Field, Panola and Harrison Counties, Texas, reasonably supported by substantial evidence? I think this question should be answered in the affirmative. If I am correct in this, then, we do not reach the question discussed by the majority. The question deemed controlling by the majority as stated in the second paragraph of its opinion is:

"Substantially the only question for decision here is whether or not the evidence shows as a matter of law that respondent's gas producing properties are being confiscated, or in other words, was the order of the Railroad Commission reasonably supported by substantial evidence."

I construe this to mean that the majority is holding that the order as to confiscation was not supported by substantial evidence.

Respondent states in his petition filed in the District Court

that he challenges the validity of Commission Order No. 32619. That order was entered because the respondent had violated Special Order No. 20-27-088, the Statewide Density Order. In other words, as will be hereinafter shown, respondent secured a permit to drill four wells on four units, the acreage of 640 acres in each unit having previously been assigned to four wells. These four wells were drilled by respondent in accordance with the density order governing the Bethany Field. I shall hereafter refer to the first four wells as the "legal wells" and the last four as the "illegal wells."

The order denying the application for exceptions to the density order recites facts showing that permits were obtained by respondent to drill the "illegal wells" by filing applications which did not represent the true facts. Respondent failed to disclose in these four applications that the four "illegal wells" said to be in the Elysian Fields Field were included in the units covered by his four previous applications for the "legal wells" in the Bethany Field.

The respondent presented the two sets of applications in such language and form that no exception to the spacing rule or the density rule was required. The permits in each instance were issued for regular locations.

In 1954 and 1955, respondent made application to drill a gas well on each of the unitized tracts (640 acres) in the Bethany Field. Each well location was within the 2640-1320 spacing distances required by the Bethany Field rules and each unit was of sufficient size to constitute a 640-acre proration unit. So far as this record shows the law and the rules of the Railroad Commission were strictly followed so far as the "legal wells" are concerned .

The fact that the Bethany Field and the Elysian Fields Field were later merged and combined by order of the Commission dated September 13, 1955, and the two fields were found to be producing from a common reservoir does not validate the wrongful acts of the respondent committed prior to the order of merger of the two fields. At the time the respondent presented both sets of applications it was not even known that the two fields were producing from a common reservoir. The fields were separate and distinct entities, and the Bethany Field rules were substantially different from those in the Elysian Fields Field. In the Bethany Field the spacing rules provided that no gas

well shall be drilled nearer than 2640 feet to any well on the same tract or nearer than 1320 feet to any line constituting the limits of a proration unit, a 160-acre spacing pattern. Proration units of 640 acres with a ten per cent tolerance in acreage were established, and the allocation formula for determining allowables was based upon 2/3 acreage and 1/3 well.

In the Elysian Fields Field the spacing rule provided that no gas well shall be drilled less than 933 feet to any well on the same tract or nearer than 330 feet to any property line, a 20-acre spacing pattern. Proration units of 320 acres with a ten per cent tolerance in acreage were established, and the allocation formula for determining allowables was based on 100% acreage times bottom hole pressure. Both the Bethany and the Elysian Fields Field rules provided that the spacing distances were minimum distances to allow an operator flexibility in locating a well and that the spacing rule and the other rules promulgated were designed to permit only one well to each proration unit.

Respondent violated three of the four important provisions of the statewide density order (640 acre unit) by misrepresenting the facts in his applications for permits to drill the four "illegal wells." By so doing he gained an advantage by eliminating from consideration by the Commission of the matter involved in the fourth provision, that is, he by false representations got the equivalent to an exception to the density provisions of the Statewide Density Order, supra, without a hearing and without presenting the matter to the Commission for determination. The applications were sworn to by the respondent and represented a desire to drill four wells on four units of approximately 320 acres each in the Elysian Fields Field. Each location was shown to be within the 933-330 spacing distance required by the Elysian Fields Field Rule. Therefore, it is clear that the applications showed no information which would require exceptions to the spacing rule or the density rule. Such being the factual representations, the Commission issued permits for the four wells in the Elysian Fields Field for regular locations. Had the respondent disclosed in his sworn applications that the land on which he proposed to drill the four wells had previously been included in the units covered by his applications to drill the "legal wells" in the Bethany Field, the Commission would not have granted the permits. Respondent, no doubt, would have gotten by, but for the fact that after he obtained gas production from the four "illegal wells" it became necessary for him to go back to the Railroad Commission for an

order fixing the allowables for each well. It was at this time the false representations were discovered, and the Commission refused to grant the applications for allowables. Then, for the first time, respondent sought a hearing on exceptions to the Statewide Density Rule. The Commission refused to grant the exceptions, but it is clear, at least to me, that the Commission denied respondent relief primarily on the fact that he had violated the Commission's rules and regulations, and without regard to the issue of confiscation. In other words, without regard to whether the order denying the exception to the density order was supported by substantial evidence, the order denying the exception because of the apparent deliberate violation of the Commission's rules and regulations was supported by substantial evidence and is and was sufficient within itself to deny respondent the relief he seeks in the present case.

Respondent should not be permittd to dedicate four 640 acre tracts, all the land in issue, to the Bethany Field 640 acre proration units, and then in subsequent applications without stating in such applications that he had without authority carved out of such units four units of 320 acres each. By doing so he got two wells for each 640 acres instead of one well for each such unit. It must be remembered, in this connection, that while it is true the Commission did hold a hearing on respondent's application for an exception to the Statewide Density Order there is no evidence that respondent filed applications other than those designating that the wells were to be drilled in the Elysian Fields Field. In fact, on the day of the hearing, respondent filed affidavits that the acreage within his original four Bethany applications consisted of the acreage remaining after he carved out the Elysian Fields Field units.

Thus, it is seen, that none of the acreage originally designated to the Bethany Field units has ever at any time been lawfully separated from the original units. Respondent's misrepresentations could not change this fact, and I don't think that the Commission by holding a hearing under the circumstances intended to or was in a position to by holding such hearing waive the strict requirements of the law governing its duties. The Commission held the hearing and on February 20, 1956 entered its order setting out all the findings of facts I have been discussing and in addition thereto made the following findings and order:

"WHEREAS, From evidence adduced at said hearing, the Commission is of the opinion and finds that no exception was

requested to reduce the acreage assigned to the Bethany gas units prior to the affiant's request for Elysian Field well permits; that the unitized tract plats accompanying the requests for permits to drill Elysian Fields Field wells did not indicate thereon the acreage which had been previously dedicated to Commission approved Bethany Field well locations on said unitized tract plats; that such actions on the part of affiant were violative of the express provisions of Special Order No. 20-27-088, dated August 28, 1953; and

"WHEREAS, From evidence adduced at said hearing, the Commission is of the opinion and finds that the well density on the four unitized tracts in question is one well to each 640 acres which is in accordance with the density pattern allowed by the Bethany Field special field rule; that no good and sufficient reason was advanced at said hearing which would justify exception to said special field rule either for the prevention of waste or for the protection of correlative rights.

"NOW, THEREFORE, IT IS ORDERED by the Railroad Commission of Texas that the application of C. F. DeBardeleben, Jr., together with his motion for rehearing on same, for exceptions to the Density Order for his four wells in the Bethany Field, Panola and Harrison Counties, Texas, be and they are hereby denied."

It was from this order that respondent appealed by filing this suit in the District Court. It is clear that unitized tracts once accepted by the Commission cannot be *subdivided* thereafter without the approval of the Commission. The hearing prior to the order of February 20, 1956 was not, as contended by respondent, a hearing involving the drilling of second wells on unitized tracts, but to the contrary, each of the applications for the wells here in issue affirmatively states that *the wells were to be drilled on a 320 acre tract on which no other well had been drilled.* Another thing, it seems to me that to permit respondent under the record in this case to have his four "illegal wells," would be to absolutely ignore the Railroad Commission's Rule 37 spacing rule. No exception to the spacing rule was applied for, neither was it granted. Therefore, the effect of the judgment of the trial court and the Court of Civil Appeals is to grant exceptions to the spacing rule without requiring the erspondent to properly comply with the rules which provide that applications for exceptions to both the spacing rules and density rules promulgated by the Commission shall

first be filed and considered by that body after notice of hearing. The commission, as heretofore indicated, is bound by its own rules and cannot legally act to the contrary if it so desired. Under the record in this case, the Commission was without lawful authority to validate the four "Ilegal wells." But, be that as it may, the Court was certainly without authority to consider the question of confiscation.

Petitioner agrees that this holding does not work a forfeiture of the four "illegal wells." It contends that the case at bar is similar in principle to the cases of Railroad Commission v. Magnolia Petroleum Company, Texas Civ. App., 125 S.W. 2d 398, er. ref. and Cheesman v. Amerada Petroleum Corporation, Texas Civ. App., 227 S.W. 2d 829, (no writ history.)

I agree with the petitioner. Respondent under the record in this case was without lawful application and the record before the Commission justified its order that respondent's proof of confiscation, if any, was of no avail since the application (pleadings so to speak) did not show *all of the acreage covered by the units in question.* This failure, together with other misrepresentations alone, justified the order of February 20, 1956 regardless of the merits, that is, the proof offered by the respondent on the question of confiscation.

However, if we assume that the question of confiscation was before the Commission, I contend that the Commission's order is supported by substantial evidence. The respondent in his petition did not complain or claim that he was entitled to additional wells because of waste. His only contention in the trial court was that he was entitled to an exception to the Density Rule on the ground of confiscation. He makes the contention that he has a vested property right in the oil under his land; that he has not been afforded his fair share of the oil and gas in the fields (not just the Bethany field), and that by reason of drainage his inherent property right is being deprived him. On this point, I agree with the petitioner when it says:

"Since DeBardeleben was entitled to no wells as a matter of right on his 640 acres unitized tracts except the four original wells he had thereon, his only contention that he was entitled to the four new wells because of confiscation, must go for naught, because to grant him additional wells on this ground would give every operator to the east, south and west the same ground for exceptions to the density rule."

To allow this in the Bethany Field would totally destroy the one well to 640 acres proration-conservation program.

Since the evidence before the trial court did not establish that the order denying an exception to the Density Rule was illegal, unreasonable and arbitrary, and since the order was supported by substantial evidence, the Commission's denial to respondent of exceptions to the Density Rule should be upheld.

I shall not attempt to set out the evidence or point out in this opinion wherein the evidence is lacking. Suffice to say, if respondent is not getting his fair share of the gas produced from the Bethany Field, he has a way to proceed so as to get that fair share. He accepted the 640 acre unit, one well to the unit without protest. He voluntarily put all the acreage involved in the four units and got his one well per unit.

Now, if he is not getting his fair share, one way he could get relief if he can make out a case, would be on the basis of allowables by either limiting the allowables for the sixteen wells to the north, or increasing the allowables for the 103 wells to the south. Certainly, confiscation has not been shown.

I would reverse the judgments of both courts below, and dismiss the cause without prejudice to the right of respondent to file a proper application to the Commission.

Opinion delivered July 24, 1957.

Rehearing overruled October 2, 1957.