H. M. HARRINGTON, Jr., Appellant,

v.

RAILROAD COMMISSION of Texas et al., Appellees (three cases).

Nos. A–9702 to A–9704.

Supreme Court of Texas.

Jan. 29, 1964.

Rehearing Denied March 18, 1964.

C. K. Richards, Houghton Brownlee, Jr., Austin, for appellant.

Waggoner Carr, Atty. Gen., Austin, Joseph Trimble, Asst. Atty. Gen., Powell, Rauhut, McGinnis, Reavley & Lochridge, Frank Douglass, Austin, with above firm. J. K. Smith, Fort Worth, for appellees.

CALVERT, Chief Justice.

The three cases to be decided were tried together in the trial court and were submitted jointly in this court on direct appeal. The cases originated as suits in the nature of appeals to the district court by Harrington from orders of the Railroad Commission of Texas.

Harrington is one of the oil operators caught up in the East Texas "slant-hole" dragnet. Two wells drilled by him as lessee on tracts of 1.1 and 5.25 acres in 1948, and a third well drilled on a tract of 34.7 acres in 1949 in which he acquired an interest in 1960, were found by directional survey in 1962 to be deviated from the vertical to a greater extent than was authorized. By order of the Railroad Commission the three wells were ordered disconnected from pipe lines and were sealed. Thereafter, Harrington applied to the Commission for permits to redrill, straighten and correct the well bore of the existing wells, or, alternatively, to drill substitute wells. The Commission denied his applications.

By his suits Harrington seeks to set aside the three orders and to enjoin the Commission from interfering with his drilling operations. The Commission is aided in its defense of the validity of its orders by Humble Oil & Refining Company and Pan American Petroleum Corporation, intervenors. The trial court has upheld the validity of the Commission's orders and has denied injunctive relief. We hold that Harrington is legally entitled to the permits applied for and we grant the injunctive relief sought.

Although the facts in the three cases differ to some extent, decision of common

questions of law will dispose of all. The salient facts in the three cases are undisputed.

All three existing wells are located along the eastern edge of the East Texas oil field, and all were drilled under permits regularly issued by the Commission as exceptions to Rule 37 to prevent confiscation. Validity of the permits has never been questioned in legal proceedings. The well bore of each of the wells is deviated from the vertical by more than fifteen degrees and is bottomed under a lease in which Harrington owns no interest. We may assume that deviation and completion under adjoining leases was intentional. The permits for drilling the wells on the two small tracts contained "straight-hole" clauses, which provided for a hearing before the Commission before an allowable would be assigned if the well bore was deviated more than three degrees from the vertical. Upon completion of each of the two wells Harrington filed an affidavit showing a deviation of less than three degrees. Had the Commission known the true facts, an allowable would not have been assigned the wells until the excessive deviation in the well bores was corrected.

Each of the existing wells has produced as much or more oil than was originally in place beneath the tract on which it is located, and will produce many times the original reserves if redrilled vertically and granted a normal allowable of production. However, this advantage in production is one shared by the three wells in common with other wells in the area because all are producing from a common pool and the water drive of the oil is from west to east. Developments since the wells were drilled have established that they would have been as productive, or substantially as productive, had they been drilled true to the vertical.

Determination of the issue which the parties seem to agree, in their post-submission briefs, is the true issue between them, is decisive of the cases. In their post-submission brief appellees put the heading of their argument in all three cases in this form: "THIS IS A GARDEN VARIETY RULE 37 CASE." In his post-submission brief appellant insists that these are not ordinary Rule 37 cases; that, on the contrary, they involve applications to redrill wells drilled long ago under Rule 37 permits. On this crucial issue we agree with appellant. But first, we must notice the reasons given by the Commission for its action on the applications to redrill.

In its order denying one of the applications the Commission gave as reasons: (1) that the lease had "produced substantial quantities of oil in violation of the rules and regulations of the Commission"; (2) that the applicant had "not shown legal justification for violating the terms of the drilling permit"; and (3) that the applicant had "failed to show the use of diligence in the drilling" of the tract. No reasons were given for denying the other two applications. For opinion purposes we will assume the reasons were the same as those given for denying the first application.

■ If, as reasons (1) and (2) seem to indicate, the basis for the Commission's orders is punishment of appellant for violating the terms of his permits, or for wrongfully producing oil from beneath adjoining tracts or leases, the orders are void for want of power in the Commission so to punish. The Legislature has expressly provided the sanctions and penalties which may be imposed for violating the conservation laws or the rules, regulations and orders of the Commission promulgated thereunder.

Article 6033 [1] requires an owner or operator of an oil or gas well to secure from the Commission a certificate showing compliance with conservation laws and conservation rules, regulations and orders of the

---

1. All article references are to Vernon's Texas Civil Statutes unless otherwise expressly indicated.

Commission before he may secure a pipe line connection, and empowers the Commission to cancel any certificate of compliance when it appears that in the operation of the well or in the production of oil and gas such laws or rules are being violated. That sanction has been applied against appellant and his wells have been shut in for more than a year. Article 6036 authorizes the imposition of a penalty on any person violating the conservation laws or Commission rules and regulations of $1,000 for each day of violation and for each act of violation, the penalty to be recovered in a suit by the State of Texas to be prosecuted by the Attorney General. Article 6066a defines "Unlawful oil" as including oil which has been produced in this State "in violation of any law of said State or in violation of any order of the Commission", and authorizes the seizure and forfeiture of such oil to the State. Article 1111c, Sec. 2, Vernon's Ann. Penal Code, makes it a felony, punishable by confinement in the penitentiary for not less than two nor more than five years, knowingly to cause an officer or employee of the Commission to issue a permit relating to oil which misrepresents the true facts with respect to the oil, or to cause the issuance of such a permit with intent to defraud.

■ The sanctions and penalties thus expressly provided by the Legislature are exclusive, and the Commission has no power to impose different or additional sanctions or penalties of its own devising. The power is necessarily denied to the Commission by Art. 3, Vernon's Ann.Penal Code, which provides that "no person shall be punished for any act or omission, unless the same is made a penal offense, and a penalty is affixed thereto by the written law of this State", which provision implements the design of the Penal Code declared in Article 1 to be "to define in plain language every offense against the laws of this State, and affix to each offense its proper punishment."

■ Appellees seem to suggest that the power to punish by denying the applications to redrill is conferred by Article 6036, which states that the penalty there provided, heretofore noticed, is in addition to penalties "that may be imposed by the Commission for contempt for the violation of its rules, regulations, or orders." We do not interpret this language to mean that the Commission is empowered to devise its own penalties for unlawful conduct or 'for violations of its rules and orders. No doubt the quoted language refers to the power conferred by Article 6024 wherein the Commission is authorized "to punish for contempt or disobedience of its orders as the district court may do." Penalties which may be imposed for contempt by the district court are specifically expressed in Article 1911, and no others may be imposed. Moreover, if the quoted language were interpreted to authorize the Commission to provide penalties differing from those provided in the statutes, we would be confronted with a grave problem of the constitutional authority of the Legislature to delegate this power. See 1 Am.Jur.2d 937, Administrative Law, § 127; 11 Am.Jur. 965, Constitutional Law, § 244; 1 Tex.Jur.2d 661, Administrative Law, § 17.

The Commission's reason (3) for denying the permits evidently refers to a lack of diligence in drilling a straight hole. The reason was given with respect to the application for a permit to redrill the well on the 1.1 acre tract which had been drilled originally within six months of the issuance of the permit in keeping with the terms of the permit. This reason seems to be the basis of a phase of appellees' principal argument in this court.

■ Appellees are not limited in their defense of the validity of the Commission's orders to the reasons assigned by the Commission for entering them. If there is any legal basis for the orders they must be upheld, and it is immaterial that the reasons given for them are unsound. Texas Employment Commission v. Hays, Tex.Sup., 360 S.W.2d 525, 527; Gulf Land Co. v. Atlantic Refining Co., 134 Tex. 59, 131 S.W. 2d 73, 84; Railroad Commission of Texas

v. Magnolia Petroleum Co., 130 Tex. 484, 109 S.W.2d 967, 970.

Appellees' principal defense in this court of the validity of the orders is based upon the premise that by virtue of noncompliance with the Commission's rules and regulations and the terms of the original permits in drilling the existing wells, appellant abandoned such permits; or, alternatively, the permits were cancelled automatically by an order of the Commission issued October 19, 1955, which provides that all Rule 37 permits not theretofore utilized would be considered cancelled if not utilized within six months. From this premise the argument is that the applications to redrill are applications for new Rule 37 permits; that to be entitled to the permits the burden was on appellant to establish that his oil would be confiscated if they were not granted; that the Commission's orders of denial raise a presumption that appellant's oil would not be confiscated; that appellant did not establish on the trial that the Commission's order was not supported by substantial evidence; that, on the contrary, evidence adduced at trial establishes conclusively that as to each tract appellant has already recovered more oil than was originally in place beneath the tract, and thus that the Commission's implied finding of no confiscation has support in substantial evidence.

If appellees' premise were sound, the cogency of this argument would not be open to dispute; but the premise is not sound. No decided cases are cited in support of it, and logic negates it.

■ The two facets of the premise are bottomed on kindred theses—abandonment and non-utilization of the rights granted by the permits. The difference between the theses is that under the first the rights granted by the original permits would have been forfeited at some indefinite time by operation of law, whereas under the latter they would have been forfeited within six months of the date of the Commission's order in 1955; but the logic of both is that misuse of the permits is the same as nonuse.

This cannot be so, under either statutory law or the Commission's own rules and regulations. If it were so, every innocent violation of the Commission's rules and regulations governing drilling operations or of the terms of a drilling permit would work a forfeiture of rights conferred by the permit; otherwise, forfeiture would operate as a penalty which we have held the Commission has no power to impose. Utilization of a permit is effected when a well is drilled at its designated surface location.

■ Appellant's permits were issued to prevent confiscation of property. The Commission had no legal right, under its own rules, to issue the permits except upon a finding that they were necessary to prevent confiscation, and whether they were necessary for that purpose is not open to question at this late hour. Midas Oil Co. v. Stanolind Oil & Gas Co., 142 Tex. 417, 179 S.W.2d 243. There is no suggestion that the permits were procured by fraud as were the permits in Railroad Commission of Texas v. De Bardeleben, 157 Tex. 518, 305 S.W.2d 141, in which the right to permits as of the time they were issued was reconsidered and re-evaluated. Two of the permits contained stipulations that they would terminate unless drilling operations were begun within six months. The wells were drilled in both instances within the stipulated period. The third permit contained no such stipulation. This well was drilled and produced for several years before the Commission's order of October, 1955, was entered. All were drilled at their designated surface locations. The undisputed facts establish that the rights granted by the permits were not abandoned; that, on the contrary, they were utilized with reasonable diligence through exercise of the right to drill, albeit the well bores were deviated to a greater degree than was authorized and were bottomed under adjoining leases.

■ We have said that the wrongful deviations did not operate to work a forfeiture of the rights granted by the permits under either statutory law or the Commis-

sion's own rules and regulations. Pertinent here are the provisions of Article 6033, of the "straight-hole" clause, and of State-wide Rule 54.

Article 6033 provides that before any owner or operator of an oil or gas well may connect with a pipeline he must obtain from the Commission a certificate showing compliance "with the oil or gas conservation laws of the State and conservation rules, regulations and orders of the Commission." The article then empowers the Commission to cancel a certificate of compliance when it appears that an owner or operator "has violated or is violating, in connection with the operation of said well or the production of oil or gas therefrom, any of the oil or gas conservation laws of this State or any of the rules, regulations or orders of the Commission promulgated thereunder." The article further provides: "Upon notice from the Commission that a certificate of compliance as to any oil or gas well has been cancelled by it as herein provided, it shall be unlawful for the owner or operator of such well to produce oil or gas therefrom until a new certificate of compliance covering such well has been issued by the Commission as herein provided."

The "straight-hole" clause made a part of two of the permits requires that an inclination survey be run for each 500 feet drilled and that a report of the information obtained by the survey, together with information with respect to whether a whipstock was used in the drilling, be filed with the Commission in the form of an affidavit by a party familiar with the facts. It provides that an allowable for the well "will not be established nor shall such well be produced prior to the filing of these data in the manner prescribed." If the well bore is not deviated more than three degrees from the vertical and if a whipstock is not used in drilling, the clause requires the assignment of an allowable. If the deviation of the bore hole is greater than three degrees from the vertical or a whipstock is used in drilling, the clause requires that a direc-

tional survey be run and filed with the Commission showing the path traversed by the bore hole, together with a letter of explanation, whereupon the Commission will hold a hearing, with notice to offset leaseholders, to determine "whether or not the well shall be permitted to be produced." The clause further provides that pending this hearing "no allowable shall be assigned this well nor shall it be produced."

The Commission's general State-wide Rule 54, regulating the deviation of wells, was adopted on March 7, 1949. By its terms it is not applicable to wells drilled before its adoption, but it throws light on the issue of abandonment and non-utilization. The Rule provides for the granting of permits to deviate under certain circumstances. Upon filing an application for a permit to drill a deviated hole, an operator is authorized to proceed to do so at his own risk; and if he fails to show good and sufficient cause for the deviation, "no permit will be granted for the production of the well." The concluding paragraph of the Rule reads: "Any well hereafter directionally deviated from its normal course which does not conform with the provisions of these rules shall be corrected by the operator to conform to these rules, or shall be plugged and abandoned."

The foregoing summary of the provisions of Article 6033, the "straight-hole" clause made a part of two of appellant's permits and State-wide Rule 54 clearly exclude the idea that valid drilling permits and the legal rights arising therefrom may become forfeited by abandonment or non-utilization merely because Commission rules and regulations or the terms of a permit are violated by excessive deviation in drilling. The statute speaks of the withholding or cancellation of a certificate of compliance and prohibits production until compliance with the laws and the Commission's rules and regulations has been obtained and a new certificate issued, thus recognizing the right to correct non-compliance. The "straight-hole" clause speaks

only of refusing to set allowables and of denying the right to produce while the well bore is deviated, thus recognizing the right to correct the excessive deviation. Rule 54, as we interpret it, expressly recognizes the right of an operator to correct an excessive deviation on penalty of having the well ordered plugged and abandoned. Drilling at an established surface location may be a condition to the right to drill, but drilling a straight hole obviously is not. Summarizing, we hold that the rights to drill granted by the three permits were not conditioned on the drilling of straight holes; that statutes, regulations and terms of the permits relating to deviation only affected appellant's right to produce and to the fixing of his allowables; and that his rights to drill vertical holes and to produce oil therefrom were not abandoned and were not lost through excessive deviation. It follows that the applications to straighten and correct the well bores of the existing wells are not "garden variety Rule 37" cases, and the Commission was not authorized to deny the applications on the ground that they were not necessary to prevent confiscation.

Appellees' final defense of the orders is that the Commission is authorized to refuse to permit production from the three wells until they have made up through their normal allowables all of the oil they had produced before being sealed. The fallacy in this defense is that the granting of drilling permits and the fixing of allowables are entirely separate conservation activities. See Halbouty v. Railroad Commission, Tex. Sup., 357 S.W.2d 364, and Halbouty v. Darsey, Tex.Civ.App., 326 S.W.2d 528, writ refused, N.R.E. Appellees seem to recognize this to be so, but suggest that it will avail appellant nothing to redrill if he is later denied the right to produce oil from the wells.

■ The only question rightfully involved in these cases is whether appellant has a legal right to redrill and straighten the well bores of the three existing wells and whether the Commission shall be enjoined from interfering with his drilling activities in doing so. We hold that appellant has a legal right to redrill and straighten the existing wells and that the Commission's orders denying him permits to do so are unauthorized in law and therefore arbitrary. That holding disposes of the only issue in the case. However, inasmuch as it is suggested that the Commission will claim the right to refuse to permit the wells to produce until they have made up through normal allowables all past production, we give our attention to that matter to avoid further litigation.

■ Testimony on the trial indicates that the Commission follows a policy of requiring wells which have overproduced to make up the overproduction by thereafter producing less than their normal allowables. Under appellees' theory if the allowables for the three wells when redrilled is the same as in the past, the wells will be shut in for the same number of producing days in the future as they have been permitted to produce in the past. This policy seems to be at odds with a 1939 opinion of the Attorney General advising the Commission that the policy was not legally authorized. We need not, and do not, undertake to resolve the difference between the Commission and the Attorney General, because in the cases before us there is no evidence of overproduction. It seems to be undisputed that, although perhaps unknown to the lessees at the time they were drilled, the wells could and would have been just as productive had the wells been drilled within authorized limits of deviation. Thus there may have been illegal production, but in the record before us there is no evidence of overproduction. Assuming the wells could and would have produced the same amount of oil if they had been properly drilled, any such shut-in as that suggested would be nothing more than an unauthorized penalty.

The judgment of the trial court is reversed, and the Railroad Commission of Texas and its officers, agents and employees

are restrained and enjoined from interfering with appellant in redrilling and straightening to within authorized limits the well bores of the existing wells on the three tracts described in his petition.

STEAKLEY and NORVELL, JJ., dissented.

STEAKLEY, Justice (dissenting).

I am in full agreement with the majority holding that the Railroad Commission cannot impose different or additional penalties or sanctions otherwise provided by law as punishment for unlawful acts. But this is not the problem as I view the case.

I do not agree that Harrington obtained absolute drilling rights upon the *granting* to him of the original drilling permits, as exceptions to Rule 37, to prevent confiscation of his minerals, or that Harrington's rights are unaffected by his entire failure to drill and produce the wells authorized by the permits.

I assume, as does the majority opinion, that Harrington intentionally deviated the wells so as to bottom the wells under, and hence so as to produce oil from, the leases belonging to his neighbors in which he owned no interest. It is self-evident that these drilling operations, and the subsequent production of oil, were different from, and contrary to, the drilling and production rights authorized by the permits. In no sense can it be said that Harrington drilled for oil, and has subsequently produced oil, pursuant to, or under, or as authorized by, the permits; his drilling operations were so foreign to the permits for which he applied, and which he was granted, as to be the same, in legal effect, as if he had started drilling on his neighbor's surface. In the context here, an intentional deviation so as to complete a well under the property of another is no different from starting the well on the surface of land belonging to the other and drilling to the same place. Surely the majority cannot say that

"Utilization of a permit right is effected when a well is drilled" on the surface of another. Yet wherein is there substantial difference in deliberately drilling from an authorized surface point to an unauthorized subsurface point under the lease of another? But, continues the majority opinion, the rights granted by the permits here "were utilized with reasonable diligence through exercise of the right to drill, albeit the well bores were deviated to a greater degree than was authorized and were bottomed under adjoining leases." Would the majority say the same "albeit the well bores were started on lands belonging to another and bottomed under leases belonging to another," and thus just as much not authorized?

The majority opinion also says that the necessity for the original permits to prevent confiscation "is not open to question at this late hour." With this I agree. But what is open to question is whether the new permits sought by Harrington to redrill, and correct the intentional deviations, are necessary to prevent confiscation of his minerals *at this time*. This is not to say that the continuing effect of Rule 37 permits, under which operations have been, and are being, conducted in good faith and in substantial conformity, are open to question. It is to say that when the holder of a validly issued permit intentionally fails to drill and produce as authorized, in the substantial and flagrant manner shown here, and after such a course of conduct invokes the jurisdiction of the Commission by an application for a permit to drill as originally authorized, the question of whether the permit to redrill is required to prevent confiscation necessarily recurs and is subject to consideration by the Railroad Commission. Otherwise, the holder of a permit would be permitted to drain his neighbor indefinitely, or until dry, by means of an intentional deviation under the neighbor's lease, and then assert the right to drill and produce his own lease under the same permit.

This is not a forfeiture of rights; it is a case where rights have never accrued or

vested. The permits could have ripened into rights of such a nature as to preclude re-examination of the question of the necessity of the permits to prevent confiscation. But the holder of the permit chose not to drill the wells authorized by the permits. He has never drilled them. He chose to drill to, and obtain production from, a place, and under a lease, for which he had not been granted authority, and in which he had no rights; he has drilled wells for which he had no permits. His wells are outlaw wells. He cannot claim rights he would have had had he drilled the wells authorized by the permits. I am unable to follow the reasoning of the majority opinion that all the permit holder was required to do to utilize his permits, and to possess all rights incident thereto, was to break ground at the authorized surface location on his own leases; and this notwithstanding that when he broke ground he was headed for his neighbor's lease. This is not a matter of the permits being conditioned on the drilling of a straight hole, as the majority puts it; it is a matter of deliberately not drilling the wells authorized by the permits. It is quite obvious why one drilling a deviated well to be intentionally bottomed under the lease of his neighbor would not start the drilling on the surface of his neighbor where all could see what was happening.

Now, after drilling and producing for many years by means of wells which he had no authority to drill, and which the Railroad Commission could not authorize him to drill, Harrington seeks authority to drill and produce wells on his own lease. He is entitled to do so only if now, under present conditions, the wells are necessary to prevent confiscation of his minerals.

I would think that there must be a bona fide effort to drill a well in conformity with a drilling permit granted to prevent confiscation, together with substantial compliance therewith, before the conditions with reference to confiscation, upon the basis of which the permit was granted, will no longer be open to question. I do not think that this can exist where a well is intentionally drilled in nonconformity with the permit, and for the purpose of producing oil from a place and in a manner for which no authority has been granted or could be granted. Whatever the resulting situation may be in this latter instance should be subject to consideration by the Railroad Commission in determining whether the well originally authorized, but not drilled, is still necessary to prevent confiscation. If the Railroad Commission denies an application to redrill, as it has done here, its order is valid if supported by substantial evidence. The orders here have not been shown to be otherwise; they must therefore be upheld regardless of the reasons assigned by the Commission in support of its action.

I would affirm the judgment of the trial court.

NORVELL, J., joins in the dissent.