TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






ON MOTION FOR REHEARING







NO. 03-99-00114-CV






Daimler-Benz Aktiengesellschaft, Appellant



v.



Scott Olson, Individually and as Independent Executor of the Estate of Karen L. Olson,
and Vickie Olson, Appellees





FROM THE DISTRICT COURT OF BELL COUNTY, 169TH JUDICIAL DISTRICT


NO. 158,786-C, HONORABLE RICK MORRIS, JUDGE PRESIDING 







 The opinion and judgment issued herein on March 23, 2000 are withdrawn, and
the following opinion is substituted in lieu of the earlier one.

 In this appeal, we consider the contacts with Texas of a foreign parent corporation
that designs and manufactures cars abroad, but has established a North American subsidiary to
import and distribute those cars in the United States, including Texas. Appellant Daimler-Benz
Aktiengesellschaft (Daimler-Benz) brings an interlocutory appeal from the district court's order
overruling its objection to personal jurisdiction. See Tex. R. Civ. P. 120a. The suit from which
this appeal arises is a products liability action brought against Daimler-Benz by appellees Scott
Olson, the son of the decedent, Karen Olson, and executor of her estate, and Vickie Olson,
Karen's daughter. We will affirm the district court's order.


FACTUAL AND PROCEDURAL BACKGROUND

 Alleging that the Mercedes-Benz car Karen Olson was driving caught fire shortly
after a van collided with it, causing Karen's death, the Olsons sued Daimler-Benz and the owner
of the van, Central Produce Company of Temple, Texas. The accident occurred on April 3,
1995, in Temple, Texas. Scott and Vickie are Texas residents; the Mercedes-Benz Karen owned
before her death was registered in Texas. The Olsons claimed that Daimler-Benz defectively
designed and manufactured Karen's car, and that the defects caused her death. Daimler-Benz
made a special appearance to challenge its amenability to suit in Texas. The district court
overruled Daimler-Benz's objection, finding that jurisdiction over Daimler-Benz in Texas was
proper.

 Daimler-Benz is a German corporation with its principal place of business in
Stuttgart, Germany. As shown in its annual reports, Daimler-Benz is a holding company with
four corporate units: Mercedes-Benz, Daimler-Benz Industrie, Daimler-Benz Aerospace, and
Daimler-Benz InterServices. These units, which comprehend all subsidiary corporations of
Daimler-Benz, form the Daimler-Benz Group. The Mercedes-Benz corporate unit accounts for
a preponderant share of Daimler-Benz's profit; in 1994, the Daimler-Benz Group earned profits
of 0.9 billion deutsche marks, while the Mercedes-Benz unit returned 1.8 billion deutsche marks,
its earnings being offset by losses in other corporate units. (1) The Mercedes-Benz unit contains
both a passenger car division and a commercial vehicle division. In 1994, the Mercedes-Benz unit
sold 592,400 passenger cars worldwide, 73,000 of these in the United States.

 In 1995, the Daimler-Benz Group consisted of Daimler-Benz and its 319 domestic
and foreign subsidiaries; in 1994, Daimler-Benz's subsidiaries numbered 357. Within the
Mercedes-Benz corporate unit, subsidiaries apparently exist for every western European country,
as well as for Brazil, Argentina, Nigeria, South Africa, Turkey, Iran, India, Japan, Indonesia, and
Australia. In addition to establishing Mercedes-Benz of North America, Inc., Daimler-Benz has
established Mercedes-Benz Canada, Inc., and Mercedes-Benz Mexico, S.A. de C.V.

 Mercedes-Benz of North America, Inc. (MBNA) is the sole importer and distributor
in the United States of Mercedes-Benz cars and parts. MBNA, a Delaware corporation with its
principal place of business in Montvale, New Jersey, is a direct, wholly owned subsidiary of
Daimler-Benz North America Corporation (DBNAC). DBNAC, also a Delaware corporation but
with its principal place of business in New York City, is a direct, wholly owned subsidiary of
Daimler-Benz. (2)

DISCUSSION

 In two issues on appeal, Daimler-Benz contests the court's decision that Daimler-Benz is subject to the jurisdiction of Texas courts. A Texas court may exercise jurisdiction over
a nonresident defendant if the Texas long-arm statute authorizes the exercise of jurisdiction and
the exercise of jurisdiction comports with due process. Guardian Royal Exch. Assurance, Ltd.
v. English China Clays, P.L.C., 815 S.W.2d 223, 226 (Tex. 1991); see Tex. Civ. Prac. & Rem.
Code Ann. § 17.042 (West 1997 & Supp. 2000). The broad language of the long-arm statute
permits an expansive reach, limited only by the federal constitutional requirements of due process. 
Schlobohm v. Schapiro, 784 S.W.2d 355, 357 (Tex. 1990). As a result, we consider only
whether it is consistent with federal due process for Texas courts to assert personal jurisdiction
over Daimler-Benz. Guardian Royal, 815 S.W.2d at 226.

 The federal due process clause protects a person's liberty interest in not being
subject to binding judgments of a forum with which that person has established no meaningful
contacts, ties, or relations. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 471-72 (1985) (citing
International Shoe Co. v. Washington, 326 U.S. 310, 319 (1945)). Under the federal
constitutional test of due process, a state may assert personal jurisdiction over a nonresident
defendant only if the defendant has purposefully established minimum contacts with the forum
state and the exercise of jurisdiction comports with traditional notions of fair play and substantial
justice. Id. at 476. The ultimate test of minimum contacts is whether the defendant purposefully
availed itself of the privilege of conducting activities in Texas, thereby invoking the benefit and
protection of Texas laws. Schlobohm, 784 S.W.2d at 357-58. This requirement ensures that a
nonresident defendant will be haled into court only as a result of its intentional activities, so that
it is reasonable for the nonresident defendant to expect the call of a Texas court. Guardian Royal,
815 S.W.2d at 226; Schlobohm, 784 S.W.2d at 357-58. 

 The minimum contacts analysis has been refined into two types of
jurisdiction--general and specific. Specific jurisdiction exists when the cause of action arises out
of or relates to the nonresident defendant's contacts with the forum state. Guardian Royal, 815
S.W.2d at 230. The defendant's activities must have been purposefully directed toward the forum
state. Id. at 228. Under specific jurisdiction, the minimum contacts analysis focuses on the
relationship among the defendant, the forum, and the litigation. Id.

 General jurisdiction exists when the defendant's contacts with the forum state are
continuous and systematic, even if the cause of action does not arise from or relate to activities
conducted within Texas. Id. For general jurisdiction, the minimum contacts analysis is more
demanding, requiring a showing of substantial activities within the forum state. Schlobohm, 784
S.W.2d at 357.

 The existence of personal jurisdiction is a question of law, but proper exercise of
that jurisdiction must sometimes be preceded by the resolution of underlying factual disputes. We
determine the appropriateness of the trial court's resolution of those disputes by an ordinary
sufficiency of the evidence review based on the entire record. Conner v. ContiCarriers &
Terminals, Inc., 944 S.W.2d 405, 411 (Tex. App.--Houston [14th Dist.] 1997, no writ). If the
trial court's order is based on undisputed or otherwise established facts, we conduct a de novo
review of the order. Id. A defendant who challenges a court's exercise of personal jurisdiction
through a special appearance carries the burden of negating all bases of personal jurisdiction. 
Kawasaki Steel Corp. v. Middleton, 699 S.W.2d 199, 203 (Tex. 1985); Siskind v. Villa Found.
for Educ., Inc., 642 S.W.2d 434, 438 (Tex. 1982); Nikolai v. Strate, 922 S.W.2d 229, 236 (Tex.
App.--Fort Worth 1996, writ denied); Hayes v. Wissel, 882 S.W.2d 97, 99 (Tex. App.--Fort Worth
1994, no writ).

 When a trial court overrules a special appearance, the defendant should request
findings of fact under Texas Rule of Civil Procedure 296. Runnells v. Firestone, 746 S.W.2d
845, 849 (Tex. App.--Houston [14th Dist.]), writ denied per curiam, 760 S.W.2d 240 (Tex. 1988). 
Because the trial court made no findings in this case, all facts necessary to support its judgment
are implied. Worford v. Stamper, 801 S.W.2d 108, 109 (Tex. 1990); In re W.E.R., 669 S.W.2d
716, 716-17 (Tex. 1984); Runnells, 746 S.W.2d at 848. When a complete reporter's record
exists, however, these implied findings are not conclusive and an appellant may challenge the
sufficiency of the evidence to support them. Roberson v. Robinson, 768 S.W.2d 280, 281 (Tex.
1989). When such points are raised, the standard of review to be applied is the same as that to
be applied in the review of jury findings or a trial court's findings of fact. Id.

 Thus, we will set aside a finding of the trial court only if the finding is so against
the great weight and preponderance of the evidence as to be manifestly erroneous or unjust. In
re King's Estate, 244 S.W.2d 660, 661 (Tex. 1951); Runnells, 746 S.W.2d at 849. In reviewing
such a point of error, we must consider and weigh all of the evidence, both the evidence that tends
to prove the existence of a vital fact as well as evidence that tends to disprove its existence. Ames
v. Ames, 776 S.W.2d 154, 158-59 (Tex. 1989); Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986). 
So considering the evidence, if a finding is so contrary to the great weight and preponderance of
the evidence as to be manifestly unjust, the finding should be set aside, regardless whether some
evidence supports it. Watson v. Prewitt, 320 S.W.2d 815, 816 (Tex. 1959); King's Estate, 244
S.W.2d at 661.

 If evidence supports the implied findings of fact, we must uphold the trial court's
judgment on any legal theory supported by the findings. Worford, 801 S.W.2d at 109; Point
Lookout West, Inc. v. Whorton, 742 S.W.2d 277, 278 (Tex. 1987); Runnells, 746 S.W.2d at 848. 
This is so regardless of whether the trial court articulates the correct legal reason for the
judgment. Harrington v. Railroad Comm'n, 375 S.W.2d 892, 895 (Tex. 1964); Fish v. Tandy
Corp., 948 S.W.2d 886, 891-92 (Tex. App.--Fort Worth 1997, pet. denied); Marifarms Oil &
Gas, Inc. v. Westhoff, 802 S.W.2d 123, 125 (Tex. App.--Fort Worth 1991, no writ). We review
the legal conclusions supporting the judgment to determine whether they are correct as a matter
of law. Lawrence v. Kohl, 853 S.W.2d 697, 699 (Tex. App.--Houston [1st Dist.] 1993, no writ).


AFFIDAVITS

 Before the pretrial hearing on Daimler-Benz's objection to jurisdiction, the Olsons
filed two affidavits in support of jurisdiction--the affidavits of Susan Tarver and Mark Einfalt. 
Daimler-Benz filed written objections to these affidavits at the conclusion of the hearing. After
considering the objections, the trial court overruled them. We review the trial court's evidentiary
rulings on Tarver's and Einfalt's affidavits for an abuse of discretion. St. Paul Fire & Marine
Ins. Co. v. Confer, 956 S.W.2d 825, 831 (Tex. App.--San Antonio 1997, pet. denied). An abuse
of discretion occurs when a court acts without reference to guiding rules or principles, or acts
arbitrarily or unreasonably. Downer v. Aquamarine Operators, Inc., 701 S.W.2d 238, 241 (Tex.
1985).

 The Olsons argue that Tarver's affidavit qualifies as a record of regularly conducted
activity and is admissible under the business record exception to the rule against hearsay. See
Tex. R. Evid. 803(6). The foundation for the business record exception has four requirements:
(i) the record was made and kept in the course of regularly conducted business activity; (ii) it was
the regular practice of the business activity to make the record; (iii) the record was made at or
near the time of the event that it records; and (iv) the record was made by, or from information
transmitted by, a person with knowledge; the person with knowledge must have acted in the
regular course of business, or as it is sometimes put, must have had a business duty to report. 
See Steven Goode, Olin Guy Wellborn III, & M. Michael Sharlot, Courtroom Handbook on Texas
Evidence, Authors' Commentary 407-08 (1994).

 Tarver is the west coast manager of Port Import Export Reporting Service (PIERS),
a division of The Journal of Commerce. PIERS operates a database that tracks all imports and
exports transacted through U.S. ports. The Freedom of Information Act in conjunction with the
U.S. Customs regulations authorizes press organizations to copy certain official shipping
documents, such as manifests and bills of lading, and make them available to the public. The 125
reporters mentioned in Tarver's affidavit collect import and export information from all U.S. ports
as contained on bills of lading, vessel manifests, and other official shipping documents submitted
by steamship companies to the U.S. Customs Service. Additionally, PIERS has access to U.S.
Customs' Automated Manifest System data tapes. These official shipping documents are made
at or near the time by (or from information transmitted by) a person with knowledge and are kept
in the course of regularly conducted shipping activity. It is the regular practice of the shipping
industry, as required by federal law, to keep such records and information. Further, after
collecting the data from these sources, the staff of PIERS regularly verifies that the information
in its database is accurate. The trial court did not abuse its discretion in finding that Tarver's
affidavit satisfies the foundational requirements of the business records exception.

 Additionally, publications of market prices or statistical compilations that are
proven to be generally recognized as reliable and regularly used in a trade or specialized activity
by persons so engaged are admissible for the truth of the matter published. Tex. R. Evid.
803(17); Curran v. Unis, 711 S.W.2d 290, 296-97 (Tex. App.--Dallas 1986, no writ) (citing Lewis
v. Southmore Savs. Ass'n, 480 S.W.2d 180, 186 (Tex. 1972)). Tarver testified that the
information in the PIERS database is relied upon by the public, U.S. Customs Service, U.S. Trade
Development Offices, and other U.S. agencies, in addition to commercial offices of foreign
governments, commercial banks and currency dealers, port authorities, consultants, equipment
manufacturers, freight forwarders, importers and exporters, law firms, and manufacturers. PIERS
information is regarded by these governmental agencies and private entities as accurate and
reliable in the same way as reports of interest rates posted in The Wall Street Journal. The
exception to the hearsay rule for published compilations generally used and relied on by persons
in particular occupations also supports the admission of Tarver's affidavit.

 Mark Einfalt's affidavit contains as attachments pleadings and discovery submitted
in this case, Daimler-Benz's and DBNAC's annual shareholder reports from 1990 through 1995,
information from the web sites of Daimler-Benz, DBNAC, and MBNA, and several commercial
reports. Daimler-Benz argues that the attachments are not properly identified and authenticated. 
Einfalt averred that, within his personal knowledge, the attachments are accurate copies of the
original documents; Einfalt then identified the attachments. This testimony properly authenticates
the attachments. Tex. R. Evid. 901(b)(1). Daimler-Benz's argument that documents printed from
web sites must be authenticated by testimony establishing the system from which the printouts
were obtained and the accuracy of the printouts was not presented to the trial court, and we do
not consider it. Tex. R. App. P. 33.1(a).

 Daimler-Benz also states globally that the commercial reports and web site
documents attached to Einfalt's affidavit constitute hearsay. Assuming the trial court erroneously
admitted these documents, however, Daimler-Benz fails to explain how their admission probably
caused the rendition of an improper judgment. See id. 44.1(a). In addition, Daimler-Benz offers
no argument that distinguishes among these documents. The documents showing their source as
Daimler-Benz's web site, for instance, merit a different analysis than those labeled as commercial
reports. Daimler-Benz's contention is too general to require us to search for error. We therefore
decline to hold that the trial court abused its discretion in admitting Einfalt's affidavit and its
attachments.


PERSONAL JURISDICTION

Minimum Contacts

 Daimler-Benz contends that it lacked the systematic and continuous contacts with
Texas required to confer general jurisdiction on Texas courts. We will examine the record for
evidence of Daimler-Benz's activities in 1996, when the Olsons filed suit, and for a reasonable
time before 1996. Our review will include evidence of Daimler-Benz's allegations in a federal
lawsuit, the corporate structure of Daimler-Benz, its distribution agreement with MBNA, and its
Internet web site.

 Daimler-Benz presented evidence that it has never been authorized to do business
and has never done business in Texas, has no officers, agents, or employees in Texas, does not
own or possess any office, plant, or warehouse in Texas, and has no equipment, inventory, or
books and records in Texas. Further, Daimler-Benz offered evidence that it has no mailing
address, telephone listing, bank account, or other real or personal property in Texas. It has never
appointed an agent for service of process in Texas and has never sold Mercedes-Benz cars in the
U.S.

 Daimler-Benz and the Olsons stipulated to certain facts in the trial court. They
agreed that MBNA buys U.S.-version Mercedes-Benz vehicles in Germany from Daimler-Benz. 
MBNA ships those vehicles to U.S. ports of entry and then to various vehicle preparation centers,
which MBNA owns or leases and operates. MBNA also ships parts it has bought from Daimler-Benz in Germany to U.S. ports of entry and then to parts distribution centers, which MBNA owns
or leases and operates. Daimler-Benz and MBNA have executed a distribution agreement, which
grants MBNA the exclusive right to import and distribute U.S.-version Mercedes-Benz passenger
cars and parts for the U.S. The agreement also licenses MBNA to use certain Daimler-Benz
trademarks. Daimler-Benz designs and manufactures U.S.-version Mercedes-Benz vehicles to
comply with applicable federal and state regulations so that they can be certified as compliant and
sold to MBNA in Germany for marketing and distribution by MBNA in the U.S., including the
state of Texas. Vehicles not intended for sale to MBNA are not necessarily so designed,
manufactured, or certified.

 The parties also agreed that the 1980 Mercedes-Benz 500SE Karen Olson was
driving when the collision occurred was not a U.S.-version vehicle. The car was first sold to a
customer in Stuttgart, Germany; neither Daimler-Benz nor any of its subsidiaries played any role
in importing the car to the U.S. The car was designed and manufactured by Daimler-Benz in
Germany for the European marketplace; it was not designed for the U.S., was not sold to a
Daimler-Benz subsidiary for export to the U.S., and was not marketed in or placed by Daimler-Benz in a stream of commerce destined for the U.S. Daimler-Benz does, however, design,
manufacture, and sell vehicles in a stream of commerce intended for the U.S. market, including
the state of Texas.

 Further, the parties stipulated that Daimler-Benz has never advertised the sale of
Mercedes-Benz vehicles in Texas; rather, MBNA and its local, authorized dealers advertise U.S.-version Mercedes-Benz vehicles for sale in Texas. Neither entity advertises the sale of non-U.S.-version Mercedes-Benz vehicles in Texas.

 The parties' stipulations amount to judicial admissions, which normally are
conclusive on the party making them. See Mendoza v. Fidelity & Guar. Ins. Underwriters, Inc.,
606 S.W.2d 692, 694 (Tex. 1980). Although evidence controverting an admission is barred, a
party relying on the admission must protect the record by objecting to the introduction of
controverting evidence. Marshall v. Vise, 767 S.W.2d 699, 700 (Tex. 1989); Houston First Am.
Savs. v. Musick, 650 S.W.2d 764, 769 (Tex. 1983). In this case, the Olsons submitted as
evidence before the trial court the petition filed by Daimler-Benz and MBNA in 1998 in a Texas
federal district court. See Daimler-Benz Aktiengesellschaft v. Moghimi, No. 3-98 Civ. 1308-H
(N.D. Tex. Aug. 18, 1998). (3) Pleadings in another case that are inconsistent with a party's
position in a present action are quasi-admissions, which are treated as some evidence. DowElanco
v. Benitez, 4 S.W.3d 866, 871 (Tex. App.--Corpus Christi 1999, no pet. h.). We will set out the
relevant allegations Daimler-Benz made in its petition in federal court before addressing the
inconsistencies.


 1. Daimler-Benz's Federal-Court Petition

 In its federal-court petition, Daimler-Benz and MBNA sued Ray Moghimi, a car
dealer in Dallas, for unlawfully using federally registered trademarks and service marks. 
Daimler-Benz stated in the petition that it owned, and had registered in the United States Patent
and Trademark Office, the famous trademarks and service marks Mercedes-Benz and the design
of a three-pointed star. Daimler-Benz alleged that it had continuously, over many decades, used
its trademarks and service marks throughout the state of Texas to identify and distinguish its cars,
parts, accessories, and related products, as well as the maintenance and repair services furnished
by its licensed dealers. Numerous Mercedes-Benz cars, parts, and accessories, and extensive
maintenance and repair services, have been advertised and furnished under these marks by
authorized dealers in Texas. Daimler-Benz and MBNA have spent large sums of money to use,
promote, and advertise the trademarks and service marks in commerce, with the result that the
marks have attained "extraordinary fame and inestimable good will" and now rank among the
most distinctive marks in Texas. Because of their long and extensive use, Daimler-Benz and
MBNA's marks have become recognized by the public as identifying Daimler-Benz and MBNA
and the quality cars, parts, accessories, and services sold by them and their authorized dealers. 
The excellence of these products and services has earned Daimler-Benz and MBNA "a valuable
reputation and tremendous goodwill" with the public, symbolized by the trademarks and service
marks. Daimler-Benz and MBNA alleged that by unlawfully using the trademarks and service
marks, Moghimi had engaged in unfair competition, had intended to injure their business
operations, and had injured their business reputation and interfered with their advantageous
business relationships.

 The allegations of the petition conflict with the parties' stipulations as to Daimler-Benz's advertising: while the parties stipulated that Daimler-Benz itself has never advertised
Mercedes-Benz vehicles in Texas, Daimler-Benz pleaded in federal court that it had spent large
sums of money to advertise its trademarks and service marks, with the result that its marks had
attained inestimable good will and now ranked among the most distinctive in Texas. Because
Daimler-Benz failed to object to the controverting statement on the ground that it was relying on
the stipulation, it has waived its right to rely on the stipulation. Marshall, 767 S.W.2d at 700. 
The controverted stipulation as to advertising is thereby reduced to the status of a quasi-admission,
which is not conclusive, but is merely some evidence for the fact finder to consider. See
Mendoza, 606 S.W.2d at 694. The allegations in the federal-court petition as to advertising, being
likewise controverted, also remain quasi-admissions. DowElanco, 4 S.W.3d at 871.


 2. Judicial Admissions

 The remaining allegations in Daimler-Benz's petition in federal court, summarized,
are that Daimler-Benz owned and had registered in this country certain trademarks and service
marks; that Daimler-Benz had long used its marks throughout Texas to identify its cars; that this
long and extensive use had caused the public to recognize the marks as identifying Daimler-Benz
and the cars it sold; that the excellence of the cars had earned Daimler-Benz a valuable reputation
and tremendous goodwill, which were symbolized by its marks; and that the unlawful use of its
marks constituted unfair competition, was intended to injure Daimler-Benz's business operations,
and had injured its business reputation and interfered with its business relationships. As stated,
pleadings in another case that are inconsistent with a party's position in a present action are quasi-admissions. Id. If certain conditions are met, however, quasi-admissions can rise to the level of
formal judicial admissions. Mendoza, 606 S.W.2d at 694; DowElanco, 4 S.W.3d at 871. The
policy underlying this rule is that it would be unjust to allow a party to recover after it has negated
its right to recover by clear, unequivocal evidence. Mendoza, 606 S.W.2d at 694; DowElanco,
4 S.W.3d at 871.

 To be treated as judicial admissions, quasi-admissions must meet five criteria: (1)
the statements relied on were made during the course of a judicial proceeding; (2) the statements
are contrary to an essential fact embraced in the theory of recovery or defense asserted by the
person making the statements; (3) the statements were deliberate, clear, and unequivocal; (4)
giving conclusive effect to the statements will be consistent with the policy on which the rule is
based; and (5) the statements are not also destructive of the opposing party's theory of recovery. 
Mendoza, 606 S.W.2d at 694; United States Fidelity & Guar. Co. v. Carr, 242 S.W.2d 224, 229
(Tex. Civ. App.--San Antonio 1951, writ ref'd).

 The statements we have summarized were made in a judicial proceeding, are
contrary to Daimler-Benz's assertion here that it lacks contacts with Texas, and are not destructive
of the Olsons' theory of recovery. Further, the statements deliberately and unequivocally recount
Daimler-Benz's activities in propagating its trademarks and service marks throughout Texas. 
Giving conclusive effect to these statements is consistent with the policy that a party should not
be allowed to prevail on its assertions after clearly negating those assertions before a judicial
tribunal. Because the allegations in Daimler-Benz's federal-court petition meet the requirements
for being considered judicial admissions, Daimler-Benz is bound by those allegations in this suit. (4) 
We therefore consider it established that Daimler-Benz's long and extensive use in Texas of its
trademarks and service marks has caused the public to identify the marks with Daimler-Benz and
the cars it produces. The excellence of its cars has earned Daimler-Benz a valuable reputation
with the public, which is also symbolized by its marks. It is necessarily implied from Daimler-Benz's allegations that it has engaged in competition and has established business relationships and
business operations in Texas. See Hutcherson v. Sovereign Camp, W. O. W., 251 S.W. 491, 492
(Tex. 1923) (trial court may find inferential facts that, as matter of law, are necessarily inferred
from facts judicially admitted); Davis v. State, 904 S.W.2d 946, 950-51 (Tex. App.--Austin 1995,
no writ). Thus, the allegations show that Daimler-Benz used its marks in Texas to create
recognition for itself as part of a system of marketing its vehicles in Texas. Daimler-Benz
established business operations in Texas and competed in the Texas marketplace for vehicle sales. 
Daimler-Benz's marketing system, which also involved its subsidiary MBNA and numerous
dealerships, had economic value, which Daimler-Benz acted to protect by resort to the judicial
system.


 3. Alter Ego

 Generally, a foreign parent corporation is not subject to the jurisdiction of a forum
state merely because its subsidiary is present or doing business there. But if the parent
corporation exerts such dominance and control over its subsidiary that the subsidiary is simply a
conduit through which the parent conducts its business, the parent may be considered to be doing
business through the local activities of its subsidiaries. Jones v. Beech Aircraft, 995 S.W.2d 767,
771 (Tex. App.--San Antonio 1999, pet. dism'd w.o.j.); Moffett v. Goodyear Tire & Rubber Co.,
652 S.W.2d 609, 613 (Tex. App.--Austin 1983, writ ref'd n.r.e.). The degree of control exercised
by the parent must be greater than that normally associated with common ownership and
directorship. Conner, 944 S.W.2d at 419.

 Courts must examine all relevant circumstances to determine whether the parent
and subsidiary should be considered separate or joined; a variety of factors have guided courts in
making this determination: whether distinct and adequately capitalized financial units are
incorporated and maintained; whether daily operations of the two corporations are separate;
whether formal barriers between the management of the two entities are erected, with each
functioning in its own best interest; whether the two file consolidated tax returns; whether
operating capital is financed by the parent or borrowed from other sources; whether the
subsidiary's stock is owned by the parent; whether the two share common officers and directors;
the extent to which separate books and accounts are kept; whether both have common departments
of businesses; whether they have separate meetings of shareholders and directors; whether an
officer or director of the one corporation is permitted to determine the policies of the other;
whether those with whom the corporation comes into contact are apprised of their separate
identity; and the extent to which contracts between the parent and subsidiary favor one over the
other. Conner, 944 S.W.2d at 419; Moffett, 652 S.W.2d at 613. The Olsons bore the burden of
proving the type of close relationship that would enable the court to disregard the separate
corporate structures. Jones, 995 S.W.2d at 771.

 Not all of the above factors need be present or considered. In Jones, the court of
appeals analyzed the relationship between a parent corporation and its two subsidiaries and
focused on several factors indicating that the corporations should be considered as one for
purposes of personal jurisdiction: the corporations shared common ownership, officers, and
directors; the parent exercised control over the daily operations of the subsidiaries; and the clients
of the subsidiaries were not apprised of the separate identity of each entity. 995 S.W.2d at 772-73. Additionally, the court described one subsidiary as existing solely to funnel sales to the parent
and the other as directing customers to the parent for sales. Id. at 772. (5)


 a. Corporate Structure and Inter-Corporate Relations

 Daimler-Benz submitted evidence that it and MBNA have separate officers and
directors and that the two corporations have always formally maintained their separate corporate
existences. Daimler-Benz has always kept its books, records, tax returns, and financial statements
separate from those of MBNA. All real and personal property that MBNA uses or controls has
been owned by it or leased by it from parties other than Daimler-Benz.

 Undisputed evidence in the record shows that MBNA does business in Texas. The
parties stipulated that MBNA is qualified to do business in Texas. As mentioned above, the
parties stipulated that MBNA advertises U.S.-version Mercedes-Benz cars for sale in Texas;
MBNA's advertising appears in publications and newspapers directed to Texas and is broadcast
over television and radio stations throughout Texas. The evidence shows that MBNA, as the
exclusive U.S. distributor of Mercedes-Benz cars, selects its Mercedes-Benz dealers and forms
contractual relationships with them. MBNA also supervises the performance of the dealers, has
authority to terminate dealers, and handles the detailed accounting and record-keeping associated
with the dealers. MBNA's dealer network extends throughout the U.S., including the state of
Texas. The parties agreed that up until 1995, MBNA shipped Mercedes-Benz cars from Germany
to the Houston Port Authority, from which point the cars were transported to a vehicle preparation
center near Houston. Documents admitted in evidence show that from 1987 through 1990,
MBNA imported more than 18,400 Mercedes-Benz vehicles into Texas through the Port of
Houston. In 1995, 40,609 Mercedes-Benz vehicles from model years 1985 through 1995 were
in operation in Texas. To the extent Daimler-Benz disputes that MBNA does business in Texas,
MBNA's pleadings as co-plaintiff in Moghimi constitute an admission that MBNA competes in
the Texas marketplace and has established business relationships, a business reputation, and
business operations in Texas. Following our analysis above, we consider these admissions to be
judicial admissions.

 The Olsons submitted in evidence Daimler-Benz's annual shareholder reports for
the years 1990 to 1995. These show that financing for companies within the Daimler-Benz Group
is handled by Daimler-Benz and its regional finance companies; the finance companies procure
funds on national and international markets and pass the funds on to the operating companies. 
Daimler-Benz also arranges at least some aspects of purchasing for its operating companies.

 In the section of Daimler-Benz's 1992 through 1994 annual shareholder reports
titled, "The Corporate Principles of Daimler-Benz," Daimler-Benz described itself as an
international company and wrote, "Daimler-Benz does business in all corners of the globe." In
a speech given in October 1997, the chairman and chief executive officer of MBNA described
MBNA as "the organization that links our parent company in Germany and our 320 dealers across
the United States." Daimler-Benz considers the U.S. to be its largest foreign market. In Daimler-Benz's annual shareholder reports from 1990 through 1995, management's business review
consistently discussed sales of Mercedes-Benz cars in the U.S. in terms of "our" sales and the
number of cars "we" sold.

 The financial statements are presented primarily on a consolidated basis for the
entire Daimler-Benz Group, although certain figures are reported separately for Daimler-Benz. 
This format was adopted in the 1992 report, when the chairman of Daimler-Benz's board of
management stated that the company would concentrate on the consolidated financial statements,
rather than Daimler-Benz's individual performance, to reflect the growing internationalization of
the company. Notes to the consolidated financial statements in the 1992 report say that profits
earned by subsidiaries of Daimler-Benz are added to consolidated retained earnings.

 Although Daimler-Benz and MBNA do not appear to be managed by the same
individuals, Daimler-Benz describes itself as the "managing holding company" of the Daimler-Benz Group, and one member of Daimler-Benz's Board of Management is shown in the 1994
shareholder report as being responsible for Daimler-Benz's subsidiaries. The companies within
the Daimler-Benz Group contribute remuneration each year to the members of Daimler-Benz's
Board of Management. Among its principal subsidiaries, Daimler-Benz classifies MBNA as a
sales company, rather than a finance, manufacturing, holding, or service company. Although not
mentioning MBNA specifically, Daimler-Benz related in its 1993 shareholder report that in the
context of subsidiary administration, it followed and assessed ongoing projects of subsidiary
companies and drafted decisions for the "internal bodies."

 As discussed more fully below, Daimler-Benz requires MBNA to display Daimler-Benz's trademarks, including its three-pointed star. This well-known trademark, valuable to
Daimler-Benz in promoting sales of its cars, does not allow customers to distinguish Daimler-Benz
from its subsidiary MBNA or the numerous authorized dealers in Texas.

 Our review of this evidence shows Daimler-Benz as a company devoted to selling
its cars worldwide, including in Texas. To achieve this goal, Daimler-Benz has established
subsidiaries in important markets around the globe. Although Daimler-Benz strictly observes
corporate formalities, MBNA essentially connects Daimler-Benz to markets in the U.S., including
Texas. Daimler-Benz holds itself out to investors as a corporation that does business in all
corners of the globe. MBNA's classification as a sales company demonstrates that its function
is to generate sales for Daimler-Benz. The confusion of identity created by MBNA's use of
Daimler-Benz's three-pointed star is some evidence that Daimler-Benz is doing business through
MBNA. Daimler-Benz also exercises significant functions for MBNA and its other subsidiaries,
such as obtaining financing and coordinating purchasing. Further, the management of Daimler-Benz closely supervises and directs the activities of its subsidiaries. Thus, while formally
separate, Daimler-Benz and MBNA form a functional whole in promoting and marketing vehicles
in Texas.


 b. Distribution Agreement

 The distribution agreement in effect between Daimler-Benz and MBNA at the time
of Karen Olson's accident was submitted to the trial court as an attachment to the parties'
stipulations. As a part of the parties' stipulations, the agreement carries the weight of a judicial
admission. By means of the distribution agreement, Daimler-Benz conferred on MBNA the
exclusive right to distribute within the U.S. passenger cars and parts manufactured by Daimler-Benz for the U.S. market. The agreement obligates MBNA to strive for maximum imports and
sales of Mercedes-Benz vehicles. The agreement also gives Daimler-Benz the right, in a number
of situations, to determine the details of MBNA's daily operations. Under the agreement, MBNA
must inform Daimler-Benz of the prices it charges buyers and dealers, and on Daimler-Benz's
request, MBNA must determine its sales prices in consultation with Daimler-Benz. To maximize
imports and sales, Daimler-Benz has the right to determine, together with MBNA, purchase
figures and planning schedules; if the parties cannot agree, the figures determined by Daimler-Benz apply. If the parties cannot agree on the minimum quantity of vehicles MBNA must keep
in stock, Daimler-Benz can determine the minimum quantity. Likewise, in the absence of
agreement, Daimler-Benz determines the number and assortment of demonstration vehicles MBNA
must keep in stock. When MBNA performs warranty work, it must submit the warranty claim
to Daimler-Benz and keep the parts that have been replaced. Daimler-Benz is entitled to examine
the claim and the parts to determine whether the claim was justified. MBNA must report
regularly to Daimler-Benz on all advertising and sales promotions it and its dealers adopt and must
report on their results, including a statement of expenditures and copies of the sales materials. 
Daimler-Benz may pass on to other general distributors any sales and promotional materials
remitted by MBNA. Daimler-Benz reserves the right under the agreement to demand that MBNA
discontinue or alter its advertising and canvassing activities. If MBNA is unable to conclude a
transaction, it must inform Daimler-Benz so that Daimler-Benz can help with the transaction. 
MBNA must submit its annual balance sheet and earnings statement to Daimler-Benz so that
Daimler-Benz can advise MBNA on business management. Daimler-Benz can at any time send
a representative to the U.S., whom MBNA must help to carry out his assignment, in particular
by supplying information and permitting records to be inspected. Daimler-Benz must agree to the
design of all documents bearing MBNA's name.

 The distribution agreement also authorizes Daimler-Benz to impose its standards
on MBNA throughout MBNA's management and operations. The stock of vehicles that MBNA
agrees to maintain must be organized according to Daimler-Benz's principles. MBNA must
maintain showrooms that are "commensurate with the prestige of" Daimler-Benz. MBNA is to
organize its sales network to conform with Daimler-Benz's standards relating to the size and
equipping of sales premises, work organization and planning systems, and the use of data
processing systems recommended by Daimler-Benz. MBNA is responsible for training its
personnel in sales, service, parts systems, and business management and organization to conform
with Daimler-Benz's standards. MBNA also agrees to provide servicing, maintenance and repair
work for Mercedes-Benz vehicles in conformance with Daimler-Benz's standards. As part of its
servicing obligations, MBNA agrees to carry out warranty work on vehicles and parts supplied
by Daimler-Benz in accordance with Daimler-Benz's directives. MBNA must perform warranty
work on vehicles irrespective of where they were sold, including foreign versions of Daimler-Benz's vehicles, and must process warranty claims according to the instructions set out in
Daimler-Benz's manual for warranty procedure. All workshops used to provide service to
customer vehicles must meet Daimler-Benz's standards regarding size, personnel, equipment, and
organization. MBNA is to impose the same obligations accepted by it under the agreement on all
authorized workshops, service stations, and other workshops with which it enters dealer
agreements. Finally, MBNA must observe Daimler-Benz's directives in carrying out its
advertising and canvassing activities.

 The agreement expressly provides that it is in the common interest of Daimler-Benz
and MBNA to establish a corporate identity for the dealer network worldwide. To further this
corporate identity, MBNA must observe Daimler-Benz's directives in designing its interior and
exterior premises, its outdoor advertising, and its stationery. In pursuing its activities under the
agreement, MBNA has the duty to use Daimler-Benz's names, trademarks, and service marks,
subject to Daimler-Benz's approval of the manner of this use. The agreement also requires
MBNA to develop its market territory systematically and obligates MBNA to spare no effort to
sell Daimler-Benz's vehicles and "to represent directly and indirectly the interests of" Daimler-Benz. The agreement disclaims an agency relationship between Daimler-Benz and MBNA, stating
that the relationship between the parties is that of vendor-vendee and that MBNA has no right to
bind Daimler-Benz in any manner without Daimler-Benz's written consent.

 The terms of the agreement we have set forth directly align MBNA's interests with
Daimler-Benz's interest in maximizing the sales of its vehicles in the U.S. The agreement
specifically authorizes MBNA to represent, "directly and indirectly," Daimler-Benz's interests
in the United States and requires MBNA to further those interests. As detailed above, the
agreement gives Daimler-Benz extensive control over the details of MBNA's management and
operations.

 In contrast to the distribution agreement, the parties stipulated that MBNA is a
separately operated subsidiary of Daimler-Benz. Daimler-Benz also submitted evidence that
Daimler-Benz has never participated in the day-to-day conduct of MBNA's business and that, once
it has sold cars and parts to MBNA in Germany, Daimler-Benz exercises no control over MBNA
in its subsequent sales. Granting that this evidence conflicts with the distribution agreement, we
will consider the distribution agreement not as conclusive evidence, but as some evidence to be
weighed with other evidence in the record. Nevertheless, considering the distribution agreement
with the evidence of Daimler-Benz's corporate structure, we believe that it is proper to view
Daimler-Benz as doing business in Texas through the activities of MBNA.


 4. Internet Web Site with E-mail

 The parties stipulated that Daimler-Benz maintains an Internet web site by means
of which individuals around the world, including those in Texas, can communicate with it
electronically. The web site offers Internet users information about Daimler-Benz and its
worldwide products and services. On one subdirectory entitled "Mailing Service," Texas
residents can register with Daimler-Benz to receive direct mailings from Daimler-Benz
electronically. Another subdirectory allows Texas residents to communicate with and request
replies from Daimler-Benz representatives. Daimler-Benz does not offer Mercedes-Benz vehicles
for sale to Texas residents over the Internet, but refers sales inquiries from the U.S. to MBNA. 
MBNA maintains an independent web site on which it advertises U.S.-version Mercedes-Benz
vehicles available for sale at authorized dealers throughout the U.S., including Texas.

 In Texas, the continuum of Internet activities is divided into three categories for
purposes of personal jurisdiction. At one end of the scale, defendants who make contracts with
residents of other jurisdictions that involve the knowing and repeated transmission of computer
files electronically do business over the Internet. Jones, 995 S.W.2d at 772. At the other end
of the scale, defendants who establish passive web sites that do no more than make information
available to Internet users do not provide grounds for personal jurisdiction. Id. In between lie
interactive web sites, which allow users to exchange information with a host computer,
communicating with the person or company that runs the web site. In these cases, the exercise
of jurisdiction depends on the level of interactivity between the parties on the web site. Id.

 The web site Daimler-Benz maintains is interactive, allowing Texas residents to
submit comments and questions to Daimler-Benz representatives and to receive electronic mailings
from Daimler-Benz. Daimler-Benz, however, makes no sales or other contracts through its
Internet web site. While this level of interactivity standing alone might not be enough to subject
Daimler-Benz to jurisdiction in Texas, we will consider it a factor, along with the other contacts
that exist in this case. (6)

 The evidence as a whole shows that Daimler-Benz advertises its cars in Texas, that
MBNA functions essentially as an exclusive sales conduit for Daimler-Benz, and that Daimler-Benz solicits communication from Texas residents through its web site. It is conclusively
established that Daimler-Benz has business operations and relationships in Texas and that it
competes in the Texas marketplace. Implied findings in these respects support the legal
conclusion that Daimler-Benz has engaged in systematic and continuous contacts with Texas. 
Because we have determined that Daimler-Benz is subject to general jurisdiction, we need not
consider whether specific jurisdiction exists.


Fair Play and Substantial Justice

 Finally, Daimler-Benz argues that, under the second prong of the due process test,
the exercise of jurisdiction by a Texas court fails to comport with traditional notions of fair play
and substantial justice. Guardian Royal, 815 S.W.2d at 228. In deciding this issue, we consider
the following factors: (1) the burden on the defendant, (2) the interests of the forum state in
adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4)
the interstate judicial system's interest in obtaining the most efficient resolution of controversies,
and (5) the shared interest of the several states in furthering fundamental substantive social
policies. When the defendant is a resident of another nation, the court must also consider the
procedural and substantive policies of other nations whose interests are affected by the assertion
of jurisdiction by a state court as well as the federal government's interest in its foreign relations
policies. Id. at 229.

 In this case, Daimler-Benz's significant business contacts with Texas lessen the
burden on it to defend the suit in Texas. Daimler-Benz itself has already initiated litigation in a
Texas court, showing that it is capable of pursuing its legal interests in Texas and is not unfamiliar
with Texas jurisprudence. Texas's interest in protecting its citizens from defective cars that cause
injury and death within its territory is strong. The Olsons have also sued the company owning
the van that collided with Karen, and Texas undisputedly has jurisdiction over this company. The
most convenient and efficient way to resolve the entire controversy is to allow the Olsons to
proceed against Daimler-Benz in the same suit in Texas. Thus, the Olsons' interest in obtaining
convenient and efficient relief also weighs in favor of jurisdiction in Texas.

 The evidence shows that Daimler-Benz places a large volume of vehicles into a
stream of commerce destined for the United States and that Daimler-Benz's stock is traded on the
New York Stock Exchange. The federal government's foreign policy interests are not hindered
when individual states ensure that large international companies operate in an equitable business
environment in which wrongs are redressed by those responsible. The parties also stipulated that
Daimler-Benz maintains general liability insurance, including products liability insurance,
covering claims made against it worldwide. Such protection being consonant with business
policies in Germany, to allow recovery on such insurance following a judicial determination of
liability would not appear to violate Germany's policies. We conclude that the assertion of
personal jurisdiction by the district court comports with traditional notions of fair play and
substantial justice.


CONCLUSION

 Having determined that Daimler-Benz has established minimum contacts with Texas
and that the assertion of jurisdiction comports with fair play and substantial justice, we overrule
Daimler-Benz's two issues. We affirm the order of the district court.



 

 Bea Ann Smith, Justice

Before Justices Jones, Kidd and B. A. Smith

Affirmed

Filed: June 15, 2000

Publish
1. Daimler-Benz also reported its 1994 profits as 0.6 billion U.S. dollars. Using the same
conversion rate, 1994 profits of the Mercedes-Benz unit would have been approximately $1.28
billion.
2. On July 1, 1989, Daimler-Benz transferred all of its motor vehicle business, as part of a
business reorganization, to Mercedes-Benz Aktiengesellschaft. The transfer included all
contractual rights and obligations relating to the automotive business, including distribution
agreements. Mercedes-Benz Aktiengesellschaft was organized as a wholly owned subsidiary of
Daimler-Benz, incorporated in Germany with its principal place of business in Stuttgart. On May
7, 1997, in a further business reorganization, Mercedes-Benz Aktiengesellschaft's rights and
obligations were transferred back to Daimler-Benz. Mercedes-Benz Aktiengesellschaft then
ceased to exist. In our discussion of Daimler-Benz's corporate organization and activities, we will
treat the automotive business as if Daimler-Benz had always retained it.


 In 1998, Daimler-Benz and Chrysler Corporation entered into a business combination
resulting in the creation of DaimlerChrysler AG. Because this event occurred beyond the time-frame relevant to this appeal, we do not consider it in our analysis.
3. Although Daimler-Benz and MBNA filed the petition in Moghimi in 1998, their allegations
cover activities that occurred during the time relevant to our analysis, 1996 and a reasonable time
beforehand.
4. Daimler-Benz stated in the federal-court petition that the public recognizes its marks as
identifying it and MBNA "and the automobiles, parts, accessories and maintenance, repair and
related services sold and furnished by [Daimler-Benz and MBNA] and their authorized dealers." 
Because Daimler-Benz did not allege that it sold cars directly to U.S. buyers, we do not consider
this allegation to contradict the system of distribution stipulated to by the parties.
5. Although many of the factors relevant to our analysis may also be relevant in determining
whether a parent corporation should be liable for the actions of its subsidiary, the determination
whether two corporate entities are one and the same for jurisdictional purposes is distinct. See
Jones, 995 S.W.2d at 771; Hargrave v. Fibreboard Corp., 710 F.2d 1154, 1159 (5th Cir. 1983);
Wells Fargo & Co. v. Wells Fargo Express Co., 556 F.2d 406, 425 (9th Cir. 1977). The
operative question here is whether MBNA is in fact a mere "division" or "branch" of a larger
whole, such that MBNA's contacts with Texas should be attributed to Daimler-Benz. See Wells
Fargo & Co., 556 F.2d at 425.
6. Although the parties' stipulations as to Daimler-Benz's web site are stated in the present
tense and appear to have been made in 1998, other evidence shows that the web site existed in
1996. In its 1995 annual report, Daimler-Benz stated that it had improved its customer interaction
system for use on the World Wide Web; Daimler-Benz's customer interaction system allowed
customers to choose a model, color, and options to compose their ideal car on a personal
computer screen. The advanced features available on Daimler-Benz' web site in 1998, such as
live coverage of the shareholders' meeting, a history game visitors could play for prizes, a guest
book, and an order service, make it reasonable to infer that the interactive features described in
the parties' stipulations existed in 1996.



redressed by those responsible. The parties also stipulated that
Daimler-Benz maintains general liability insurance, including products liability insurance,
covering claims made against it worldwide. Such protection being consonant with business
policies in Germany, to allow recovery on such insurance following a judicial determination of
liability would not appear to violate Germany's policies. We conclude that the assertion of
personal jurisdiction by the district court comports with traditional notions of fair play and
substantial justice.


CONCLUSION

 Having determined that Daimler-Benz has established minimum contacts with Texas
and that the assertion of jurisdiction